Robert J. ENDRES, Plaintiff,

v.

**J. Lynn HELMS, Administrator Federal Aviation Administration, Defendant.**

Civ. A. No. 83–2573.

United States District Court,
Dist. of Columbia.

Aug. 22, 1985.

---

**14.** She may attend the faculty meetings of the

department she was transferred to.

Jeffrey B. O'Toole and Ann Marie Dobmeyer, Washington, D.C., for plaintiff.

John W. Polk, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

Plaintiff Robert J. Endres, a former official of the Federal Aviation Administration ("FAA"), has brought this age discrimination action against the FAA pursuant to Section 15 of the Age Discrimination in Employment Act as amended ("ADEA").[1]

---

1. That statute mandates in pertinent part that:

All personnel actions affecting employees or applicants for employment who are at least 40

This Court has jurisdiction over the matter by virtue of 28 U.S.C. § 1331 and Section 15 of the ADEA. *Bunch v. United States*, 548 F.2d 336, 340 (9th Cir.1977).

This case was tried to the Court on February 25–28, 1985. Upon consideration of the record herein, the Court issues this memorandum setting forth its initial findings of fact and conclusions of law.[2] In doing so, the Court again wishes to underscore that it does not sit as a personnel officer considering how best to organize the FAA. Rather the question before the Court is limited to a much narrower inquiry: whether the actions complained of constitute age discrimination.

### I.

Mr. Endres joined the FAA's predecessor agency, the Civil Aeronautics Administration ("CAA"), in 1947, and worked in CAA offices in Wisconsin and Illinois. Trial ("T.") at 29 (Endres). In 1950, Mr. Endres transferred to the Office of Airports at FAA headquarters in Washington, D.C. He remained in that office until he left government service in August 1980. *Id.* at 128.

Plaintiff enjoyed a number of promotions in the Office of Airports and, in 1975, was appointed chief of the Operations Division of that office, a supervisory position at the GS–15 level. *Id.* Plaintiff's professional record throughout this period including the four years he served as division chief consistently evidenced exceptional levels of achievement. Put simply, he was an exemplary employee and a first-rate manager.[3]

Shortly after plaintiff's promotion to division chief, Langhorne Bond, Esq., was named Administrator of the FAA. Mr. Bond announced that he was committed to reorganizing FAA's Washington headquarters to ameliorate two related concerns: first, Mr. Bond believed that the number of organizational units in FAA was excessive, creating an overly complex bureaucratic structure; and second, Mr. Bond concluded that FAA headquarters had a surplus of positions at the GS–14 level and above. T. at 593–602 (Bond). Mr. Bond announced two initiatives to implement the reorganization: the Field Placement Program ("FPP") and a program referred to as Strengthening Field Operations ("SFO"). *Id.* at 606, 608–09, 625, 627–28. The former program was intended to encourage voluntary reassignment of headquarters personnel to FAA's regional and district ("field") offices by prohibiting filling field positions until it was determined whether any persons in headquarters were interested in applying for field positions. It did not require involuntary reassignment. Government Exhibit 4. The latter pro-

---

years of age ... in executive agencies as defined in Section 105 of Title 5 ... shall be made free from any discrimination based on age.

29 U.S.C. § 633a(a).

When Congress enacted ADEA in 1967, it specifically excluded the federal government from the definition of employers subject to the statute. *See* 29 U.S.C. § 630(b) (1972). In 1974, Congress added Section 15 to ADEA to extend coverage to federal workers. Pub.L. 93–259, 88 Stat. 55 (April 8, 1974). Congress subsequently amended Section 15 to eliminate any upper age limit on the protected age bracket. Pub.L. 95–256, 92 Stat. 189 (April 6, 1978).

2. As discussed more fully *infra*, the Court seeks clarification from the parties concerning a number of issues and will defer entering a final judgment in this matter pending completion of the proceedings discussed in Section III.

3. *See, e.g.,* T. at 345, 355 (Ruggles) (Endres "rank[s] right at the top of supervisors"); 763–

64 (Vipond) ("best supervisor" witness ever had); 768, 769 (Swartz) (referring to an Endres project as a "little miracle" and to plaintiff as an "absolute professional"). Indeed, even many of the witnesses testifying for the government in this action joined in praising Mr. Endres' ability. *See, e.g.,* T. at 587 (Hink); 695 (Bushee) (plaintiff "was well respected by the aeronautical industry and community"). Little testimony was introduced challenging these evaluations, and the most significant testimony in this regard, Mr. Aaronson's criticism of plaintiff as inflexible and a bad listener, T. at 458–60 (Aaronson), was not credible given the overwhelming evidence presented by other witnesses disputing these criticisms, *see, e.g.,* T. at 773 (Crandall), and in light of the fact that Mr. Aaronson himself never thought enough of those concerns to make any entry in any record reflecting such criticism, or to discuss these concerns with Mr. Endres. *Id.* at 460, 525 (Aaronson).

gram, which was never really implemented, did allow involuntary transfer of employees to the field if qualified volunteers could not be identified. Government Exhibit 6; T. at 654 (Driscoll).

In 1978, Robert J. Aaronson was named Assistant Administrator for Airports. In this position, he was responsible for supervision of the Operations Division plaintiff directed as well as three other divisions: the Airports Planning Division, the Airports Engineering Division, and the Development Programs Division. Government Exhibit 24. After an initial review of the Airports Office, Mr. Aaronson concluded that Mr. Bond's concern about the need to reduce the numbers of organizational units was applicable to the Airports Office. T. at 379–80, 404–05 (Aaronson). Mr. Aaronson then developed the plan for reorganizing the Airports Office that prompted plaintiff's claim of age discrimination.

The reorganization plan envisioned two key changes in the Airports Office: first, instead of four divisions, Mr. Aaronson intended to have three: Design and Operations Criteria, Engineering Specifications, and Safety and Compliance; and second, instead of having each division have three branches, Mr. Aaronson announced that the twelve branches would be transformed

into nine "groups." *Compare* Government Exhibit 24 *with* Government Exhibit 23. Mr. Aaronson also announced a standard for determining which supervisors under the old structure would remain in supervisory positions in the new structure:[4] Under Mr. Aaronson's standard, employees would be ranked by seniority, with seniority defined as years in FAA headquarters. All supervisory positions would be allocated to those employees with the *least* seniority. The "surplus supervisors"—*i.e.*, the employees with the most seniority for whom no headquarters supervisory slots were available—were to be candidates for reassignment. T. at 382–83, 392, 419–20, 443 (Aaronson).

Mr. Endres, who was then fifty-eight years of age, had the longest tenure at FAA headquarters of all the supervisors in the Office of Airports. Government Exhibit 10. Mr. Aaronson informed Mr. Endres in early February, 1979, that Mr. Endres would no longer have a supervisory position in headquarters and that steps were underway[5] to secure his transfer to Chicago or Alaska.[6] T. at 40–41 (Endres); *Id.* at 470 (Endres); Plaintiff's Exhibit 21. Plaintiff immediately informed Mr. Aaronson that in light of his health status[7], the proposed transfer would impose great hard-

---

4. In implementing the reorganization, Mr. Aaronson detailed all affected employees to temporary assignments pending the announcement of their new positions. T. at 42. Mr. Endres learned of his temporary assignment as a programs officer shortly after he met with Mr. Aaronson in early February. *Id.*

5. Mr Aaronson did not have authority to compel a field office to take a headquarters employee he wished to place in the field. Instead he was required to contact the appropriate field supervisor to transmit the names of headquarters employees available for field assignments. T. at 550–51 (Barlow). If a field supervisor requested a particular employee and that employee refused to accept the field assignment, Mr. Aaronson would initiate proceedings to separate the employee from service in the FAA. T. at 68 (Endres).

6. The FAA's Great Lakes Region in Chicago had an opening for a Branch Chief in its Airport Division. The FAA's Alaska Region had a vacant Airport Division Chief slot.

Mr. Aaronson transmitted a list of six candidates for the Alaska job to the Director of the Alaska Region in April, 1979 but Mr. Endres was not included in this list. Plaintiff's Exhibit 146A. Mr. Aaronson had several discussions with Great Lakes Region officials suggesting Mr. Endres for the position in that region and the officials of that region agreed to request Mr. Endres. T. at 486–59 (Aaronson); 548–49 (Barlow); 562 (Isaac). Although the Chicago job was a GS–15 supervisory position, T. at 443 (Aaronson), it represented a demotion for plaintiff since he would have been going from division chief to branch chief. T. at 566 (Issac). Regardless of whether the transfer and demotion qualified as an adverse action for purposes of the Civil Service Reform Act, T. at 637 (Weithoner), it clearly qualifies as a personnel action and thus is within the scope of Section 15 of ADEA. *See supra* note 1.

7. Mr. Endres has suffered from a kidney ailment since 1945 when he retired from the Air Force. T. at 30 (Endres).

ships upon him and that he believed the procedure for selecting those employees who were to be reassigned to the field constituted age discrimination. T. at 41 (Endres); 477 (Aaronson).

On March 22, 1979, plaintiff was notified that he had been reassigned to Chicago. T. at 64 (Endres); Plaintiff's Exhibit 64. Plaintiff filed a petition with the Special Counsel of the Merit Systems Protection Board ("MSPB") challenging the transfer and an EEO complaint alleging that the proposed reassignment discriminated against him because of age. Plaintiff's Exhibit 48, 49, 50.

On July 19, 1979, Mr. Aaronson issued a notice proposing plaintiff's removal from government service for refusal to accept reassignment to Chicago. T. at 77 (Endres); Plaintiff's Exhibit 75. On August 13, 1979, the MSPB issued an order temporarily enjoining plaintiff's removal. This stay was extended for an additional thirty days on August 28, 1979. Plaintiff's Exhibits 81 and 85.

During this period, the parties entered into negotiations aimed at resolving the controversy. In September, 1979, the FAA indicated it might be willing to allow Mr. Endres to remain in headquarters in a new non-supervisory position as a GS–15 "Senior Technical Officer." T. at 78, 149–51 (Endres). Mr. James Bushee, manager of the Design and Operations Criteria Division, developed a job description for this position. T. at 677 (Bushee); Plaintiff's Exhibit 5. Mr. Aaronson "acquiesced" in this proposal, feeling coerced to accept "by the situation." T. at 511 (Aaronson).

Mr. Endres had a number of serious concerns about the job description: first, he was concerned that the scope of responsibilities was so diverse, including highly technical areas in every office in the Office of Airports, that it would be impossible for any one individual to meet the require-ments of the job, T. at 79 (Endres); second, plaintiff was concerned that bureaucratic considerations would make it impossible for him to review materials developed by other divisions with which he had no formal affiliation, *id.* at 79–81; and third, plaintiff was concerned that the overly broad range of assignments being contemplated would make it impossible for his performance to be evaluated properly. *Id.* at 87–88. Nevertheless, after communicating these concerns, Mr. Endres accepted the position in good faith, believing that the FAA would utilize his expertise and experience. T. at 87, 92 (Endres); T. at 690 (Bushee). Mr. Endres also agreed to withdraw his age discrimination complaint provided that he was reimbursed for attorney's fees and medical bills incurred in challenging the transfer as well as leave devoted to pursuing his grievance. T. at 105–07, 124–25 (Endres).[8] In fact, plaintiff never received compensation for these items and never dismissed his discrimination complaint. T. at 105–07, 112–14.

Plaintiff commenced service as Senior Technical Officer in December, 1979. Government Exhibit 20. His initial assignment was completed within a week to ten days without event. T. at 93 (Endres). Mr. Endres was then given an assignment to develop a standard regarding the extent to which FAA should require "clear zones" around the nation's airports. This was an impossible task for a single staff person, requiring sophistication in every discipline in aviation. T. at 93–97 (Endres); 203–07 (Guthrie); 245 (Chance). Because of the complexity of the clear zones issue, it had defied solution for more than twenty years and a number of recent developments posed new obstacles. T. at 693–96 (Bushee).

Subsequent developments confirmed plaintiff's concerns about the job description. Although plaintiff was responsible for advising division chiefs, he was not

---

**8.** Counsel for the government elicited no testimony disputing plaintiff's understanding regarding the existence of this condition. *See also* Government Exhibit 20 (plaintiff's memorandum to Office of Civil Rights describing acceptance of Senior Technical Officer position as "satisfactory as to employment" but stating that: "There remains [ ] a reimbursement to me of attorneys fees, medical expenses, and sick and annual leave required of me by the prohibitive personnel practices conducted in the recent Airports reorganization.").

permitted to attend staff meetings. T. at 102. Although plaintiff was required to consult with field officials, he was not permitted to travel to meet with them. T. at 97–102. Although plaintiff was required to review materials generated by other divisions, no procedure was ever established for insuring that plaintiff would receive such materials. T. at 519–20 (Aaronson).[9] Finally, although plaintiff's performance ratings were linked to successful completion of performance standards, no performance standards were ever developed for his position. T. at 89.

These difficulties had a pronounced effect on Mr. Endres. Plaintiff, who was consistently characterized as having been an energetic and productive professional prior to this period, was extremely frustrated, discouraged, and depressed. T. at 110–11. One witness characterized him as a "beaten man" who had been "stripped" of his self-assurance. T. at 336 (Lawlor); *see also* T. at 355–56 (Ruggles); 774–75 (Vipond). Although Mr. Endres attempted to secure changes in his job description, these efforts were fruitless. In August, 1980, plaintiff concluded that the intolerable

working conditions he faced left him no alternative but to resign. T. at 111 (Endres). The evidence established that were it not for those conditions, Mr. Endres would have continued to work at FAA for as long as his health allowed. *Id.*

## II.

■ To make out a *prima facie* case of age discrimination under a disparate treatment theory,[10] the plaintiff must "demonstrate facts sufficient to create a reasonable inference that age discrimination was 'a determining factor' in the employment decision." *Cuddy v. Carmen,* 694 F.2d 853, 856–57 (D.C.Cir.1982) (footnote omitted). One means of creating such an inference is for the plaintiff to show that he:

(1) belongs to the statutorily protected age group [ ], (2) was qualified for the position, (3) was not hired, and (4) was disadvantaged in favor of a younger person.

*Id.* at 857 (footnote omitted).

■ In applying these factors, the Court concludes that plaintiff did establish a *pri-*

---

**9.** The government has asked the Court to receive into evidence certain materials submitted after the completion of trial. The bulk of these materials address the extent of Mr. Endres' responsibilities as Senior Technical Officer. The Court, in its discretion will allow these materials into evidence. In addition, the Court will receive plaintiff's declaration offered in response to these materials. Review of this additional evidence, however, does not persuade the Court that Mr. Endres' position was any more meaningful than Mr. Endres indicated in his testimony. *See* Endres Declaration ¶¶ 3–4.

**10.** In a disparate treatment case, the plaintiff must establish discrimination by reason of an improper motive on the part of the employer. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Plaintiff's counsel has suggested that the reorganization of the Office of Airports might also be analyzed as an adverse impact case. As developed in Title VII actions, in adverse impact cases, the plaintiff asserts that the application of an otherwise "neutral" policy has the effect of discriminating against a statutorily protected class of persons. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

The government contends that adverse impact analysis is not applicable to cases arising under

ADEA. Although one treatise noted by the government supports this view, Schlei & Grossman, *Employment Discrimination Law* at 503 (2d ed. 1983), the bulk of scholarly opinion supports application of adverse impact analysis in age cases. 3 Larson, *Employment Discrimination* § 102.42 at 21–309 (1984) ("no reason not to apply" adverse impact analysis to age cases); Champion, *The Age/Experience Dilemma and the ADEA,* 9 Thurgood Marshall L.Rev. 51 (1983–84); Note, *Disparate Impact Analysis and the Age Discrimination in Employment Act,* 68 Minn.L.Rev. 1038 (1984).

The Second Circuit recently addressed the issue at length and concluded that adverse impact analysis is applicable to ADEA cases. *Geller v. Markham,* 635 F.2d 1027 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). The *Geller* case, like the case at bar, concerned a challenge to an employment standard that gave preference to individuals with less seniority over those with more experience. *Geller,* 635 F.2d at 1030.

Because the Court finds that plaintiff has met his burden of persuasion under the disparate treatment theory, it need not consider the sufficiency of plaintiff's claim under the adverse impact theory.

*ma facie* case. First, at the time of the reorganization, plaintiff was fifty-eight years of age, Government Exhibit 24, and thus, within the protected age group. *See supra* note 1. Second, plaintiff was eminently qualified to serve as Chief of the Safety and Compliance Division. *See supra* note 3 and accompanying text. Third, plaintiff was not selected for that position or any other comparable position in FAA headquarters. Fourth, the job was given to a younger employee, Mr. Harry D. Hink. Government Exhibit 23.[11]

■ Once the plaintiff has presented a *prima facie* case, "the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Cuddy v. Carmen*, 762 F.2d 119 (D.C.Cir.1985), ("*Cuddy II*") at 122 (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). The defendant bears only the burden of producing evidence rather than the burden of persuasion. *Krodel v. Young*, 748 F.2d 701, 705 (D.C.Cir.1984).

■ Given the "minimal" nature of this burden, *id*, the Court assumes that the government did meet this requirement. The government presented testimony that would show, if believed, that the decision not to name plaintiff as a division chief was made pursuant to a reorganization of the

Office of Airports through application of a seniority standard.

■ Assuming the government met this burden, the plaintiff must carry his "overall burden of persuasion in order to prevail." *Cuddy II*, at 123. This may be done by showing that "the reason proffered by the defendant was in fact a pretext or [ ] by showing that it was more likely than not that the defendant was actually motivated by discrimination." *Id.*

The issue turns largely on the credibility of the testimony presented by Mr. Aaronson.[12] On cross-examination Mr. Aaronson testified that it would have been preferable in terms of personnel management, to decide which employees to retain as supervisors and which to transfer to the field "on an individual, case-by-case basis." T. at 440 (Aaronson). Instead the reorganization was purportedly based on an arbitrary standard. Mr. Aaronson insisted that he did so only because the FAA personnel expert assisting him had instructed him that as a "federal government manager, [he] was precluded from making individual judgments that distinguished between individuals." *Id.* at 440–41. When asked about this issue, Mr. Driscoll, the personnel specialist who worked with Mr. Aaronson on the reorganization, stated that no such prohibition exists. T. at 670 (Driscoll).[13]

---

**11.** Mr. Hink was fifty-six at the time. As Professor Larson notes, ADEA applies to allegations of age discrimination between younger and older persons who are both in the protected age group. 3 Larson, *supra* note 10, § 98.53 at 21–46 (1984).

**12.** Many of the other witnesses, particularly those testifying for the government, shed little light on this question. For example, Mr. Bond had no direct role in plaintiff's case. Mr. Issac and Mr. Barlow had little knowledge of the reorganization (or of plaintiff's service as Senior Technical Officer) except with regard to those actions by Mr. Aaronson that were directed at them. Mr. Weithoner, the Associate Administrator for Administration in the relevant period, had only "one preliminary discussion" with Mr. Aaronson concerning reorganization and referred Mr. Aaronson to Mr. Driscoll. T. at 640 (Weithoner). Mr. Driscoll, the personnel officer for the Airports Office, who dealt with Mr. Aaronson, reported that at the time he "first met with Mr. Aaronson, he had already determined

the method he wished to use to place people in the field." T. at 657.

**13.** Indeed the government itself concedes in a post-trial brief that there is no prohibition against individual determinations. Defendant's Closing Argument 7–8 at n. 3.

The Court notes in this regard that any suggestion that federal government managers are prohibited from making individual determinations is entirely inconsistent with the thrust of ADEA: to ensure that personnel decisions are made on the basis of individual merit. For example, Congress gave extensive consideration to this question before deciding in 1978 to amend Section 15 to extend protection to virtually all federal employees age forty or over. A House Education and Labor Committee Report noted that federal personnel managers are "subject to perhaps the strongest employee protection policies" of the nation's employers. Nevertheless, the Committee concluded, based on the testimony of the chairman of the Civil Service

Moreover, Mr. Driscoll specifically denied ever telling Mr. Aaronson of any such limitation. *Id.*[14]

There is a wealth of other evidence that regardless of the impetus for Mr. Aaronson's decision to streamline the Office of Airports, age was a determining factor in the development and implementation of the seniority standard by which that reorganization was carried out. This evidence takes two principal forms: first, testimony from those in the Office of Airports who observed the reorganization; and second, statistical evidence.

In addition to Mr. Endres, a number of other witnesses testified that the reorganization was carried out in a manner intended to force older workers to retire.[15] Mr. Guthrie, who was Chief of the Development Programs Division prior to the reorganization, offered the following characterization of a letter he received informing him that if he did not wish to accept reassignment he was free to retire:

It was a sham. It was merely an invitation, "you retire." They knew my age. They knew my service. They knew where I qualified, and this was telling me to retire.

T. at 194–95. (Guthrie).[16] Similarly, Mr. Chance who was Assistant Chief of the Operations Division prior to the reorganization perceived that "something else was under foot" than an effort to achieve the best reorganization. Rather Mr. Chance observed that the reorganization was designed "to get rid of" supervisors on account of age. T. at 234–39.[17]

The statistical evidence presented in this case also supports this finding.[18] For example, Dr. Richard Seltzer's application of the T-test to the employees at issue revealed that the mean age of those persons who were supervisors prior to the reorganization who did not receive headquarters supervisory jobs was 53.7 years. In contrast, the mean age of those retained in supervisory jobs was 47.4 years. T. at 275–78. The Pearson Product Moment Correlation revealed a statistically significant relationship between tenure at FAA headquarters and age. T. at 295–97. Moreover, the statistical testimony underscored that notwithstanding Mr. Aaronson's contention that the seniority standard was adopted to preclude individual determinations, there were a number of deviations from this standard. T. at 284–86; *see also*

Commission, that federal managers had authority to make personnel decisions on a case-by-case basis. H.Rep. No. 95–527 Pt. 1, 95th Cong., 1st Sess. 3–4 (1977).

14. Moreover there is no credible evidence suggesting that Mr. Aaronson merely made an error on the question of whether he could reorganize on an individual basis. Any suggestion that the limitation was based on the SFO program is defeated by two points: first, the SFO program was never formally implemented, and second, Mr. Aaronson did not act pursuant to the SFO program as he did not attempt to solicit volunteers for transfer as it envisioned. T. at 654 (Driscoll); Government Exhibit 6. The government's suggestion that Mr. Aaronson formed this impression based on Plaintiff's Exhibit 154 is also defeated by the latter point as well as the fact that Mr. Aaronson had no knowledge concerning this document. T. at 528–29 (Aaronson).

15. The Court is mindful that plaintiff has standing only to raise the claim that he was himself a victim of age discrimination. Nevertheless, because the personnel decisions plaintiff challenges are inextricably linked to the overall re-

organization of the Office of Airports, the Court believes that evidence regarding the treatment of other older persons affected by the reorganization is instructive.

16. There is additional support for Mr. Guthrie's understanding in the circumstances surrounding his retirement on disability soon after the reorganization. Mr. Guthrie filed the application for disability expecting it to be rejected. T. at 195. The personnel officer handling it told him that it would not be approved but that the personnel office was required to allow it to be filed. T. at 195–96. Much to Mr. Guthrie's surprise, the request was approved. T. at 196.

17. Indeed, Mr. Chance filed an age discrimination complaint challenging his status in the reorganization and prevailed in a trial conducted by a hearing examiner. T. at 239–41 (Chance); Plaintiff's Exhibit 129.

18. The Court appreciates that because of the small size of the sample at issue in this case, statistical evidence may have somewhat less reliability than would otherwise be the case. T. at 706–07 (Wyant).

T. at 707–08 (Wyant notes same exceptions). In each such deviation, a younger employee was favored over an older employee. T. at 284–90 (Seltzer).[19]

Plaintiff also met the burden of persuasion with regard to his claim that his resignation from the FAA resulted from age discrimination. In the Court's view, the evidence established that plaintiff faced working conditions that were so intolerable that a reasonable person would have felt compelled to resign. *Welch v. University of Texas*, 659 F.2d 531 (5th Cir.1981); *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977).[20] The Court finds that plaintiff was constructively discharged in violation of the ADEA and that the effort to force him to retire he complained of in 1979 continued until his retirement in 1980.

### III.

The Court next considers the nature of the remedy plaintiff is entitled to. Section 15 of ADEA authorizes the Court to award "such legal or equitable relief as will effectuate the purposes" of the Act. 29 U.S.C. § 633a(c). This statutory provision is a waiver of the government's sovereign immunity and must, therefore, be strictly construed. 2 Eglit, *Age Discrimination* § 18.37 at 18–147 (1984).

■■■ The complaint in this action requests the following relief:

1. Full reinstatement to a supervisory position similar to the position plaintiff held prior to the summer of 1979;

2. Back pay calculated from August 31, 1980 to the present, less accrued pay;

3. Costs, medical expenses, annual and sick leave, and reasonable attorney's fees incurred since February 1979; and

4. Such other relief as may be necessary and proper.

Plaintiff's post-trial brief provides little guidance in determining exactly what relief plaintiff is now seeking. The brief notes plaintiff's testimony that he wishes reinstatement if a job "comparable" to the job he had previously is available, T. at 776, but states that "[b]efore this can occur, [ ] the current situation will have to be assessed, which plaintiff has not had the opportunity to do at this point." Plaintiff's Post-Trial Brief at 43–44. The memorandum also suggests plaintiff may seek an award of "front pay" as an alternative to reinstatement. *Id.*[21] Regardless of whether reinstatement or front pay is available,

19. *See Johnson v. Lehman,* 679 F.2d 918, 922 (D.C.Cir.1982) ("departure from internal hiring procedures is a factor that the trier of fact may deem probative and choose to consider in determining the true motivation behind the [ ] decision").

20. In addition to the evidence cited *supra,* the Court would note that it had been years since anyone at FAA had been assigned to work on the clear zones project when Mr. Endres was given this assignment and apparently no one was assigned to it after his departure. T. at 241–44 (Chance); 698 (Bushee). Plaintiff was placed in a position where the structure of the office and the limitations imposed on him made it impossible for him to accomplish anything. *See* T. at 538–39 (Ruggles noting impossibility of "advising uphill" and functioning across division lines at division levels). The evidence supports the characterization offered by plaintiff's counsel that plaintiff was treated as a pariah in the Airports Office while serving as Senior Technical Officer.

21. The term front pay refers to an award of damages in lieu of reinstatement for the period after trial. *See Davis v. Combustion Engineering, Inc.,* 742 F.2d 916, 922 (6th Cir.1984). Although there is a division of authority over whether front pay is available as a remedy for violations of ADEA, *compare Kolb v. Goldring, Inc.,* 694 F.2d 869, 874 n. 4 (1st Cir.1982) *with Cancellier v. Federated Department Stores,* 672 F.2d 1312, 1319–20 (9th Cir.1982), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982), the majority of courts addressing the issue have recognized such relief. *See O'Donnell v. Georgia Osteopathic Hospital, Inc.,* 748 F.2d 1543, 1551 (11th Cir.1984) (citing cases); *see also Thompson v. Sawyer,* 678 F.2d 257, 292–93 (D.C.Cir.1982) (approving of front pay for prevailing plaintiffs bringing Title VII discrimination actions).

plaintiff seeks back pay[22] and liquidated damages.[23]

█ The Court seeks clarification from plaintiff's counsel as well as counsel for the government concerning a number of issues bearing on the relief available to plaintiff. The Court expresses its hope that many, if not all of these issues might be resolved by stipulation of the parties.

With regard to the issue of back pay, for example, the government properly notes that backpay should not be awarded for periods during which plaintiff was hospitalized or otherwise unable to work because of ill health if plaintiff would not have been paid for these periods. In addition, as plaintiff notes, a back pay award may reflect incidental employee benefits plaintiff would have received but for the violation. 3 *Larson, supra* note 10, § 104.31 at 21–329. Accordingly, the Court directs counsel to endeavor to reach a stipulation as to the appropriate back pay award in this action.

With regard to the question of reinstatement or front pay, the Court believes that the parties should explore whether the FAA currently has or expects to have a vacant position comparable to the position plaintiff served in prior to the reorganization. Alternatively, the parties may wish to explore whether they could reach agreement on front pay in lieu of reinstatement. If no such agreement is reached, the Court would appreciate counsel's views on whether reinstatement or front pay is the more appropriate remedy and the period for which any front pay should be awarded. *See generally* Fretz, *Home Remedies: Finding the Right Relief Under the Age*

*Discrimination in Employment Act,* 19 Clearinghouse Rev. 265, 267 (1985).

Because the Court seeks further submissions on these issues, the Court will defer issuing a final judgment at this time. The Court will afford the parties forty-five days from the filing of this order to conduct discussions concerning these matters. If at the end of this forty-five day period, the parties have not reached agreement on these issues, they are directed within fifteen days thereafter to file memoranda addressing any of these matters that have not been resolved.

**22.** Back pay can be awarded as a remedy in an age discrimination action against the government. *Moysey v. Andrus,* 481 F.Supp. 850 (D.D. C.1980); 2 Eglit, *supra* at 18–149–53.

**23.** Plaintiff's prayer for liquidated damages apparently relies on Section 7(b) of ADEA, 29 U.S.C. § 626(b), which authorizes an award of double damages pursuant to Section 16(b) of the Fair Labor Standards Act "in cases of willful violations." This action, however, is not brought against a private sector employer pursuant to Section 7(b) but against the govern-

ment pursuant to Section 15. The rule in this Circuit appears to be that liquidated damages are not available in an age discrimination suit against the government. *See Smith v. Lubbers,* 28 F.E.P. 324 (D.D.C.1982), *aff'd without op.,* 713 F.2d 865 (D.C.Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 492, 78 L.Ed.2d 687 (1983); *Muth v. Marsh,* 525 F.Supp. 604, 607 (D.D.C.1981); *see also Wilkes v. United States Postal Service,* 548 F.Supp. 642, 642–43 (N.D.Ill.1982); 3 Larson, *supra* note 10, § 103.52 at 21–355 (1984).