Teru CHANG, Appellant,

v.

INSTITUTE FOR PUBLIC–PRIVATE
PARTNERSHIPS, INC., et al.,
Appellees.

No. 02–CV–1256.

District of Columbia Court of Appeals.

Argued Nov. 12, 2003.
Decided April 8, 2004.

Gina M. Petro with whom William G. Miossi was on brief, Washington, for appellant.

Bridnetta D. Edwards, for appellees.

Before FARRELL and
WASHINGTON, Associate Judges, and
FERREN, Senior Judge.

WASHINGTON, Associate Judge:

Appellant Teru Chang ("Ms.Chang") appeals the trial court's ruling granting summary judgment to her former employer, Institute for Public–Private Partnerships, Inc., Matthew Hensley, and Edward P. White[1] (collectively "IP3"). Ms. Chang alleges that IP3 unlawfully fired her both because IP3 regarded her as disabled in violation of the District of Columbia Human Rights Act ("DCHRA")[2] and in retaliation for exercising her right to protected medical leave in violation of the District of Columbia Family Medical Leave Act ("DCFMLA").[3] Because we find, as a matter of law, that Ms. Chang did not present sufficient evidence that she was "regarded as disabled" under the DCHRA, we affirm the trial court's grant of summary judgment on her DCHRA claim. Similarly, we affirm the trial court's grant of summary judgment on her DCFMLA claim because we find that Ms. Chang could not show that IP3's legitimate nondiscriminatory reasons for firing her were pretext.[4]

## FACTUAL BACKGROUND

The Institute for Public–Private Partnerships, Inc. ("IP3") was founded in 1994 by Thomas White and appellees, Matthew Hensley and Edward P. White, "to provide global training and consulting services to players in the growing international market in public-private partnerships."[5] Prior to starting IP3, the three founders had worked for the Center for Financial Engineering and Development ("CFED") where they initially met the appellant, Teru Chang. Ms. Chang developed a rapport with Thomas White when they worked together at CFED, and she kept in touch with him after he left with the others to form IP3. According to Thomas White, the two would touch base with each other "once a month maybe" to discuss "mostly business."

In 1997, IP3's business had grown to a point where it needed a full-time accountant to perform its bookkeeping activities. At the time, Ms. Chang happened to be looking for a new job so Thomas White submitted her resume to appellants, Matthew Hensley and Edward White, for consideration. IP3 hired Ms. Chang in November 1997 to handle the accounting and bookkeeping functions of the company. From the time she was hired until March 2000, Ms. Chang reported directly to Thomas White, who, as Executive Director, oversaw the bookkeeping activities and managed the day-to-day business operations of the company.

Ms. Chang avers that throughout her employment with IP3, she received nothing but praise from her superiors.[6] It is

---

1. Edward P. White is also referred to as "Ned White."

2. D.C.Code §§ 1–2501 to 1–2557 (1999), recodified at D.C.Code §§ 2–1401.01 to 2–1411.06 (2001).

3. D.C.Code §§ 36–1301 to 36–1317 (1997), recodified at D.C.Code §§ 32–501 to 32–517 (2001).

4. Although the trial court did not rely upon this rationale when it granted summary judg-

ment on the DCFMLA claim, we may affirm for reasons other than those given by the trial court. *Adams v. United States,* 502 A.2d 1011, 1015 n. 2 (D.C.1986).

5. *See* IP3 Website, *at* http://www.ip3.org/a_description.htm (last visited April 5, 2004).

6. Ms. Chang points to a January 28, 1999 memorandum from Thomas White which accompanied a salary increase, in which Mr. White told her, "In the past year you have

undisputed that during her tenure at IP3, Ms. Chang received significant pay raises, the last of which was given in November of 2000, three months before she was terminated. Thomas White admitted that Ms. Chang "was good at what she did in terms of [the accounting] aspect of her work ... [S]he could balance checkbooks ... prepare invoices well ... match up expense reports with checks needing to go out ... [and] prepare the information from a bookkeeping standpoint that [he] needed to do [his] job." Similarly, Edward White found her to be a detail-oriented and hard-working employee.

IP3 management expressed dissatisfaction, however, with Ms. Chang's professionalism and ability to communicate with co-workers and vendors. According to Thomas White's deposition, when he was acting as Executive Director, he would often "mediate and manage her relationships" with staff to "keep people from ... butting heads and having problems" with Ms. Chang. Similarly, Edward White testified that after he took over as Executive Director in April of 2000, he received nu-

merous complaints from employees and vendors regarding Ms. Chang's behavior.[7] However, Ms. Chang was unaware of any such dissatisfaction. Her brief to this court states that at no time during her "entire three-year tenure with IP3" did anyone in management criticize her regarding her "ability to communicate or interact with coworkers or vendors, or otherwise state[ ] or suggest[ ] that her employment was in jeopardy due to poor performance ... nor was she disciplined."

In her deposition, Ms. Chang admitted that she had problems working under the supervision of Edward White. Edward White explained that, unlike his predecessor Thomas White, who "would tolerate and not act on [certain situations], my approach was that we need to act and respond to these problems and solve them." In keeping with this pro-active approach, he sent Ms. Chang a letter on April 7, 2000, that simultaneously praised her for her dedication to IP3 and warned her that she was not to continue behaving unprofessionally toward other staff members.[8]

done a fantastic job of putting IP3 straight .... We could not have done the first 90% without your perseverance. For that, I thank you .... Thank you again for your important contribution to the continued development of IP3." Ms. Chang also cites an email that Thomas White sent her on April 20, 2000, commending her for being "a key contributor and supporter to IP3 these last 2½ years. Together, we kept this company going!"

7. When asked about the nature of the complaints he had received, Edward White gave the following explanation: "Lack of cooperation, that she would criticize members of the staff and point out problems with them without working towards a solution, that she would use the office-wide e-mail system copying everybody in the office to berate members of the staff for what she thought were problems, that she called some members of the staff thieves and that she would not communicate to staff members what needed to be done

to correct an issue or a problem." Ms. Chang denies that Mr. White ever received any such complaints, and denies ever having been informed of any such complaints.

8. The April 7, 2000 letter began by praising Ms. Chang, stating, "I want you to know how much I value what you have done for IP3 during the last two and [a] half years.... IP3 is extremely appreciative of your special contribution .... Other staff members and consultants have shared with me how much they recognize the value of your contributions.... I want you to know in no uncertain terms how much I need you here and want you to continue the good work you have been doing in managing our Accounting Department." The remainder of this letter, however, informed Ms. Chang that Edward White's management style demanded that "all IP3 staff [including Ms. Chang] conduct themselves professionally both within the office and outside." While he recognized that in the past,

In November 2000, three months before she was terminated, Ms. Chang received a substantial pay raise of eleven percent. In her brief, Ms. Chang characterized this raise as "reward[ing] her outstanding performance and ensur[ing] her continued good work with IP3." Matthew Hensley characterized the raise somewhat differently in an email sent to Thomas White and Ned White on November 13, 2000. In this email, Mr. Hensley explained that the purpose of the raise was merely to secure Ms. Chang's employment through the end of the year, so that they could better prepare for a merger or acquisition. Mr. Hensley explained,

> I believe that if we are serious about transitioning to either a merger, acquisition, or new and improved IP3 starting as soon as possible, we must get through the last quarter of this year on a positive financial and administrative note.... [W]e cannot afford to lose Teru at this moment. That said, I also do not believe that it is necessarily in our best interest to have Teru remain with us in 2001 as our Chief [A]ccountant.... Effective September 1[,] 2000 (when her review was to have taken place) Teru, as an at will employee, will receive a pay raise from $72,100 to $80,100. She will receive another review no later than January 15, 2001 at which time IP3 will make a decision (after our audits, 990[']s[,] end of year accounting, etc[.] are complete) to terminate, extend and[/]or modify our relationship with Teru.... Ned and Tommy, essentially I have told Teru that she has two months to demonstrate to IP3 that she is more than just loyal and hard-working but that she can modify her behavior now to work more productively with manage-ment and staff in the future. If she cannot, she will be terminated and knows why.

In her deposition, Ms. Chang denied that Matthew Hensley ever told her that her job was in jeopardy, but she did acknowledge that she was told that any salary increase in January would be conditioned upon an improvement in her relationship with Ned White.

In January 2001, the friction between Ms. Chang and Ned White reached a crescendo after he stepped in to resolve a dispute between Ms. Chang and his new project management assistant, Faye Dance. Ms. Chang and Ms. Dance had sent each other a series of heated email messages and both had complained to Ned White about the conflict. When Thomas White, who was away on business, learned of the ongoing dispute between Ms. Chang and Ms. Dance, he sent Ned White an email stating, "[y]ou have to nip [this] in the bud right now (I hope you have already) and [get] them on a working relationship or ... we [will] terminate both of them immediately." Ned White replied that he was "heartened to hear of [Thomas White's] resolve to be willing to 'fire them' if they can't act professionally." Ms. Chang neither disputes that this conversation took place nor claims that these email messages were fabrications.

On Thursday, February 1, 2001, Ned White sent Ms. Chang an email stating, "If you believe that Faye ever acts unprofessionally towards you, you are to report it to me. You are not to, as you say 'yell' at her or behave unprofessionally yourself." Her reply to this email indicated that she had no choice but to "yell" at Ms. Dance

---

Ms. Chang "may have felt, out of frustration, that it was up to [her] to confront other staff [members]," Mr. White explained that in the future Ms. Chang was "not to confront [other staff members] nor to respond by being either uncooperative or unprofessional." Rather, she was to "report the problem directly to [him] and let [him] handle it."

"[b]ecause you can't or will not take care [of] the problems.... I am very busy, please don't waste my time any more." When he asked her directly if she was refusing to obey his instructions, she told him "yes." According to Ms. Chang, at some point during the week, Ned White had also told her to "watch out" because her performance review was coming up.

On Friday, February 2, Ms. Chang stayed home from work because she was suffering from severe chest pain and dizziness. That morning, she left a message for Thomas White that she was sick and would not be coming into the office. She visited her physician later that afternoon, and he diagnosed her with hypertension, prescribed medication, and recommended that she stay home between February 2 and February 11 so that her blood pressure could stabilize. Ms. Chang and her husband both testified that on February 5, they had each separately informed Thomas White that she had been diagnosed with hypertension and that she had been advised to stay home from work that week. By Monday, February 12, Ms. Chang had recovered sufficiently that she felt able to return to work. Her cardiologist would later confirm that her hypertension was controlled with the medication. By that time, however, she no longer had a job.

Edward White testified that during the weekend of February 3rd and 4th, he and Thomas White had discussed terminating Ms. Chang, and that on Monday, February 5, they agreed to fire her for her "consistent unprofessional behavior, insubordination, and pattern of not responding to directions from supervisors." On February 12, the day she was to have returned to work, Thomas White visited Ms. Chang at her home and told her that things weren't working out and that her employment with IP3 was being terminated.

Six months later, Ms. Chang filed the instant lawsuit, alleging in her complaint that IP3 had violated the DCHRA's prohibitions against disability discrimination, age discrimination, and national origin discrimination when it fired her. Ms. Chang's complaint also alleged that IP3 violated the DCFMLA when it fired her after she took a week of medical leave. Following discovery, Ms. Chang dropped both the age discrimination and national origin discrimination charges. IP3 moved for summary judgment on the remaining charges, and the trial court granted the motion. Ms. Chang now appeals the trial court's ruling.

## ANALYSIS

A moving party is entitled to summary judgment when there is no genuine issue of material fact and that party is entitled to judgment as a matter of law. *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C.2001) (citing *Nader v. de Toledano*, 408 A.2d 31, 41 (D.C.1979)); Super. Ct. Civ. R. 56(c). The moving party has the burden of proving that no genuine issue of material fact is in dispute. *Grant*, 786 A.2d at 583. To satisfy this burden, the moving party must " 'inform[ ] the [trial] court of the basis for its motion, and identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *Musa v. Continental Ins. Co.*, 644 A.2d 999, 1002 (D.C.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). After the movant has made this initial showing, the burden shifts to the non-moving party to prove that a genuine issue of material fact does exist. *Id.* In order to survive a motion for summary judgment, the non-moving party must present more than mere conclusory allegations or deni-

als of her adverse party's pleadings. *Id.;* Super. Ct. Civ. R. 56(e).

### A. DCHRA Claim

■ Ms. Chang alleges that she was terminated from her job because her employer regarded her as having a disability.[9] The trial court granted summary judgment· on her disability discrimination claim because it found that Ms. Chang had presented no evidence to suggest that her employer regarded her as having a disability. The trial court credited the defendants' testimony that they did not know about Ms. Chang's diagnosis at the time they made the decision to terminate her, and as a result, found that defendants could not have fired her because they regarded her as disabled. On appeal, Ms. Chang contends that the trial court improperly resolved this genuine issue of material fact in favor of the defendants, in spite of her circumstantial evidence of discriminatory motive. Because we find, however, that Ms. Chang's circumstantial evidence was insufficient to establish a prima facie case of discrimination based on a perceived disability, we affirm the trial court's·grant of summary judgment on this claim.

The DCHRA makes it an "unlawful discriminatory practice" for an employer to discharge an employee "wholly or partially for a discriminatory reason based upon [a] ... disability ...." D.C.Code § 1–2512(a) (1999), recodified at D.C.Code § 2–1402.11(a) (2001). The DCHRA then defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or *being regarded as having such an impairment.*" D.C.Code § 1–2502(5A)

(1999), recodified at D.C.Code § 2–1401.02(5A) (2001) (emphasis added). Because the DCHRA definition of "disability" closely resembles the definition of disability found in the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2) (2000), "[w]e have considered decisions construing the ADA as persuasive in our decisions construing comparable sections of [the] DCHRA." *Grant,* 786 A.2d at 583–84; *see also Howard Univ. v. Green,* 652 A.2d 41, 45 (D.C.1994); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 367–68 (D.C. 1993).

■ Similar to an ADA wrongful discharge case, Ms. Chang needed to establish four elements to make out a prima facie case of wrongful termination on the basis of a perceived disability: (1) that she was regarded as having a "disability" as defined in the DCHRA; (2) that she was discharged; (3) that at the time of her discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) that the discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 702 (4th Cir.2001); *see also Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997).

We address first—and dispositively—whether Ms. Chang has made a sufficient showing that IP3 regarded her as disabled. The Supreme Court has held that "a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv.,* 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d

---

9. Ms. Chang originally alleged that her hypertension constituted an actual disability but has withdrawn this claim and now asserts

only that she was "regarded as" having a disability.

484 (1999) (referring to its holding in *Sutton v. United Air Lines,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Grant,* 786 A.2d at 584 (citing *Croley v. Republican Nat'l Comm.,* 759 A.2d 682, 700 n. 18 (D.C.2000)) (internal citation and quotation marks omitted). Ms. Chang appears to argue that she was regarded as disabled because IP3 believed that her hypertension *substantially* limited her ability to work. Specifically, Ms. Chang has alleged that "IP3 was aware of [her] condition, presumed that she was damaged goods and would not be able to return fully to work, and then fired her based on that presumption and perception."

■ Initially, we note that even if IP3 *knew* that Ms. Chang had hypertension when it fired her, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir.1996). To say otherwise would effectively forbid an employer from taking any adverse employment action against a person it knew to be a member of a protected class, regardless of whether that employer had a legitimate reason for taking action against the employee. *See id.*

In order to prevail, Ms. Chang must show that IP3 believed her to be " 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." ' *Murphy,* 527 U.S. at 523, 119 S.Ct. 2133 (citing 29 C.F.R. § 1630(j)(3)(i) (1998)); *see also Grant,* 786 A.2d at 584. Although Ms.

Chang suggests that the timing of her termination—just days after she told her employer that she had been diagnosed with hypertension—gives rise to an inference that her employer regarded her as disabled, a jury would have to engage in pure speculation to conclude, on these facts, that IP3 believed she was "unable to perform a class of jobs." *See Murphy,* 527 U.S. at 525, 119 S.Ct. 2133 (although petitioner was fired specifically because he had hypertension, he was unable to show that his employer regarded him as limited in the major life activity of working). Because Ms. Chang cannot show that IP3 regarded her as disabled, we need not address the other three elements of her prima facie case.

### B. DCFMLA Claim

In her complaint, Ms. Chang alleged that she was terminated "in whole or in part for exercising her right to medical leave, thereby violating § 36–1307 of the D.C. Family and Medical Leave Act." The trial court granted IP3's motion for summary judgment on this claim because it found that Ms. Chang had failed to present any evidence that: (1) she suffered from a "serious health condition" covered by the DCFMLA; (2) IP3 interfered with her right to medical leave; or (3) IP3 terminated her because she took a week of leave. On appeal, Ms. Chang argues that she did, in fact, present both evidence of a serious health condition and evidence that she had been terminated because she took a week of leave. Conversely, IP3 argues that Ms. Chang's hypertension was not a "serious health condition" entitling her to protection under the DCFMLA. IP3 also argues that Ms. Chang failed to state a valid claim for relief under the DCFMLA. On the basis of the record presented, we conclude that Ms. Chang did have a serious health condition during the week she was absent from work. We also find that

Ms. Chang stated a valid claim for relief under the DCFMLA for retaliatory termination. Because Ms. Chang has failed to show that IP3's legitimate non-discriminatory reasons for firing her were pretext, however, we affirm the trial court's summary judgment ruling on her DCFMLA claim.

## 1. Serious Health Condition

The DCFMLA was designed to "ensure job security and health benefits to an employee during a temporary period of absence resulting from a ... serious health condition[ ]." COUNCIL OF THE DISTRICT OF COLUMBIA, REPORT ON THE "DISTRICT OF COLUMBIA FAMILY AND MEDICAL LEAVE ACT OF 1990," BILL 8–82, at 2 (May 30, 1990) ("REPORT"). In order to accomplish these ends, the DCFMLA provides employees of a covered employer[10] with sixteen weeks of protected medical leave during any twenty-four-month period. D.C.Code § 36–1303(a) (1997), recodified at D.C.Code § 32–503(a) (2001). The act guarantees that an "employee returning from medical leave will be restored to the same position which that employee held when the leave began, or to an equivalent position." *Harrison v. Children's Nat'l Med. Ctr.,* 678 A.2d 572, 575 (D.C.1996); *see also* D.C.Code § 36–1305(d) (1997), recodified at D.C.Code § 32–505(d) (2001). Moreover, to the extent that employment benefits were provided prior to the temporary leave period, an employer is required to continue providing those benefits after an employee takes protected leave. *See* D.C.Code § 36–1305(a) (1997), recodified at D.C.Code § 32–505(a) (2001).

The DCFMLA was intended to address many of the same policy concerns as its federal counterpart, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654 (2000). Both federal and local legislators recognized that many employers had failed to provide job security to employees who were forced by illness to take time off from work. In response, the DCFMLA and the federal FMLA were crafted to provide this needed job security while accommodating the legitimate interests of the workplace. *See* REPORT at 2, 5, *supra; see also* 29 U.S.C. § 2601(a)(4), (b)(1) (2000).

Under both the DCFMLA and the FMLA, an employee of a covered employer is entitled to take protected medical leave when unable to perform his or her job functions because of a "serious health condition." D.C.Code § 36–1303(a) (1997), recodified at D.C.Code § 32–503(a) (2001); 29 U.S.C. § 2612(a)(1)(D) (2000). The DCFMLA definition of "serious health condition" is nearly identical to the FMLA definition of the same term. The D.C. statute defines "serious health condition" as: "a physical or mental illness, injury, or impairment, that involves: (A) Inpatient care in a hospital, hospice, or residential health care facility; or (B) Continuing treatment or supervision at home by a health care provider or other competent individual." D.C.Code § 36–1301(9) (1997), recodified at D.C.Code § 32–501(9) (2001). Similarly, the FMLA defines "serious health condition" as: "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11) (2000). Therefore, under both acts, the existence of a "serious health

---

10. The DCFMLA applies to employers who employ twenty or more persons in the District of Columbia after the three-year period beginning 180 days from October 3, 1990. *See* D.C.Code § 36–1316(2) (1997), recodified at D.C.Code § 32–516(2) (2001).

condition" depends on the nature of care that is required to treat the illness.

█ In the instant case, we are called upon to decide whether Ms. Chang suffered from a "serious health condition" entitling her to DCFMLA protection. Ms. Chang's treatment for hypertension did not involve inpatient care in a hospital, hospice, or residential health care facility. Therefore, in order to find that she had a "serious health condition" within the meaning of the DCFMLA, we must determine whether she received "continuing treatment" for hypertension. *See* D.C.Code § 36–1301(9) (1997), recodified at D.C.Code § 32–501(9) (2001).

█ Although the DCFMLA does not define "continuing treatment," FMLA regulations and case law provide some insight into the meaning of this term. Because both statutes define "serious health condition" in the context of continuing treatment, we may properly look to FMLA regulations and case law as persuasive authority in interpreting our own statute. *See, e.g., Grant,* 786 A.2d at 583–84 (stating that we rely on case law construing the ADA as persuasive authority when assessing disability claims under the DCHRA because both acts contain similar definitions of "disability"); *see also Walker v. District of Columbia,* 656 A.2d 722, 725 (D.C.1995) ("[b]ecause the Superior Court's Rule 11 is virtually identical to its federal counterpart, FED. R. CIV. P. 11, this court looks to federal cases interpreting the federal rule as persuasive authority in interpreting [the local] rule") (internal citations and quotation marks omitted) (alteration in original).

Under the FMLA regulations, "continuing treatment" may include any one or more of the following:

(a)(2)(i) a period of *incapacity (i.e.,* inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.,* physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider....

29 C.F.R. § 825.114(a)(2) (2003) (italics in original). "Treatment" by a health care provider includes "examinations to determine if a serious health condition exists and evaluations of the condition," while "a regimen of continuing treatment includes, for example, a course of prescription medication ...." 29 C.F.R. § 825.114(b). Courts have interpreted these regulations to mean that an employee who is "(1) incapacitated for more than three days, (2) seen once by a doctor, and (3) prescribed a course of medication, such as an antibiotic, [ ] has a 'serious health condition' worthy of FMLA protection." *Price v. Marathon Cheese Corp.,* 119 F.3d 330, 335 (5th Cir. 1997) (citation and internal quotation marks omitted); *see also Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 163 (1st Cir.1998) (plaintiff with symptoms of angina and hypertension who took three days leave for purposes of diagnosis had a serious health condition "because he had seen a physician at least once and been placed on a treatment regimen of medication"); *Brannon v. OshKosh B'Gosh,*

*Inc.*, 897 F.Supp. 1028, 1037 (M.D.Tenn. 1995) (holding that child's throat and upper respiratory infection constituted serious health condition under FMLA where child had visited health care provider, was given a course of prescription medication, and was advised by doctor to stay home for more than three days).

Ms. Chang has presented both medical records and testimony from her physician indicating that during her absence from work, she visited her physician, was diagnosed with hypertension, was given prescription medication to treat her hypertension and was told to stay home from work for more than three consecutive days. As a result, there was sufficient evidence from which a reasonable jury could have found that Ms. Chang had a serious medical condition within the meaning of the DCFMLA.

### 2. Failure to State a Claim

 On appeal, IP3 argues that Ms. Chang failed to state a claim under the DCFMLA because her complaint did not allege that IP3 "interfered and caused her to forfeit any protected right under the DCFMLA" or claim that IP3 had retaliated against her for taking protected leave. We disagree with IP3's reading of Ms. Chang's complaint. Ms. Chang's complaint alleged that she was "terminated . . . in whole or in part for exercising her right to medical leave." Although Ms. Chang has not used the word "retaliation," her complaint fairly states such a claim under our liberal rules of pleading. *See Carter–Obayuwana v. Howard Univ.*, 764 A.2d 779, 787–89 (D.C.2001) (holding that plaintiff had stated a claim for retaliation under Title VII and DCHRA in spite of her ambiguous pleading); *see also Bible Way Church of Our Lord Jesus Christ v. Beards*, 680 A.2d 419, 430 (D.C.1996) ("liberal rules of pleading normally protect a plaintiff against dismissal of an ambiguous

complaint when it can be said to state a claim if all reasonable inferences are drawn in the plaintiff's favor").

 Whether the DCFMLA, in fact, permits a cause of action for termination in retaliation for taking protected leave is a question of first impression for this court. Both the FMLA and the DCFMLA make it illegal for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right created by the respective statutes. 29 U.S.C. § 2615(a)(1) (2000); D.C.Code § 36–1307(a) (1997), recodified at D.C.Code § 32–507(a) (2001). Both acts make it "unlawful" for an employer to "discharge" or "discriminate" in any manner against any individual for opposing any practice made unlawful by the act. 29 U.S.C. § 2615(a)(2) (2000); D.C.Code § 36–1307(b) (1997), recodified at D.C.Code § 32–507(b) (2001). Although neither statute specifically prohibits retaliation against employees for taking protected leave, the FMLA regulations prohibit employers "from discriminating against employees . . . who have used FMLA leave." 29 C.F.R. § 825.220(c) (2003). Moreover, under these regulations, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *Id.* In deference to these regulations, a majority of the circuit courts of appeal that have reviewed this type of claim have held that the FMLA protects employees from retaliation following an employee's use of protected family or medical leave. *See, e.g., Darby v. Bratch*, 287 F.3d 673, 679–80 (8th Cir.2002); *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798 (11th Cir.2000); *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir.1999); *King v. Preferred Technical Group*, 166 F.3d 887, 891–92 (7th Cir.1999); *Hodgens*, 144 F.3d at 159–60; *Williams v. Shenango, Inc.*,

986 F.Supp. 309, 321 (W.D.Pa.1997); *Morgan,* 108 F.3d at 1325. Given that the FMLA and the DCFMLA were enacted for the same policy reasons and explicitly prohibit the same conduct, we see no reason to deviate from the regulations applied by the majority of courts that have considered this issue under the FMLA. Moreover, the DCFMLA's guarantee that an employee who takes protected leave will be restored to the same or an "equivalent" position upon returning to work arguably supports a cause of action for retaliation if an employee is fired for taking medical leave. *See* D.C.Code § 36–1305(d) (1997), recodified at D.C.Code § 32–505(d) (2001). Therefore, we hold that under the DCFMLA it is unlawful to terminate an employee because that employee has taken protected family or medical leave.

### 3. Retaliation Claim

 At the outset, we note that, like the FMLA, the DCFMLA "does not immunize an employee from legitimate disciplinary action by her employer for reasons unrelated to the employee's [protected] leave." *Bond v. Sterling, Inc.,* 77 F.Supp.2d 300, 304 (N.D.N.Y.1999). In the absence of direct evidence of discrimination, we address the merits of Ms. Chang's retaliation claim under the *McDonnell Douglas* burden-shifting framework applied by a majority of the circuits in retaliation claims under the FMLA. *See, e.g., Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir.2002); *Brungart,* 231 F.3d at 798; *Chaffin,* 179 F.3d at 319; *King,* 166 F.3d at 891–92; *Hodgens,* 144 F.3d at 160; *Morgan,* 108 F.3d at 1323; *Williams,* 986 F.Supp. at 318.

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of producing evidence to sustain a prima facie case. If the plaintiff meets this burden, the employer must then produce evidence of a legitimate, nondiscriminatory reason for his action. If the employer offers a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. The ultimate burden of persuasion rests with the plaintiff to show impermissible motive or intent.

*Blount v. National Ctr. for Tobacco–Free Kids,* 775 A.2d 1110, 1115 (D.C.2001); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of retaliatory termination under the DCFMLA, a plaintiff must demonstrate that: (1) she was engaged in a protected activity; (2) her employer took an adverse employment action; and (3) there was a causal connection between the two. *See King,* 166 F.3d at 892; *Smith,* 302 F.3d at 832; *Hodgens,* 144 F.3d at 161; *Morgan,* 108 F.3d at 1325. In the instant case, Ms. Chang presented evidence that she took protected medical leave and was fired on the day she was to have returned to work. This evidence is sufficient to establish a prima facie case of retaliation. *See King,* 166 F.3d at 893 (taking FMLA leave constitutes a "protected activity," termination constitutes an "adverse employment decision," and temporal proximity between the two establishes "causal connection"). This court has previously held that close temporal proximity between a protected activity and an adverse employment action can establish a causal connection between the two. *See Carter–Obayuwana,* 764 A.2d at 792–93 (testimony that plaintiff repeatedly complained of retaliatory treatment in the days immediately prior to receiving a reduction in salary was sufficient to establish a causal connection).

 Because Ms. Chang established a prima facie case, the burden shifted to defendant IP3 to articulate a legitimate,

non-discriminatory reason for the adverse employment action. *See Blount,* 775 A.2d at 1115. Here, IP3 has presented ample evidence that it was dissatisfied with Ms. Chang's behavior at work and was actively contemplating her termination well before she ever took protected leave. The email messages sent during the week before Ms. Chang became ill establish that the friction between Ms. Chang and her co-workers had reached intolerable levels. IP3, therefore, has met its burden of producing a legitimate, non-retaliatory explanation for its firing of Ms. Chang.

The burden, then, shifted back to Ms. Chang to show that IP3's stated reason for firing her was pretext. To establish pretext, Ms. Chang presented evidence that she had received favorable reviews and pay raises from her supervisors at IP3 prior to her termination. *See Cicero v. Borg–Warner Auto., Inc.,* 280 F.3d 579, 589 (6th Cir.2002) (continuing offer of bonuses and lack of contemporaneous criticism of performance is evidence of pretext). These "favorable" reviews appear less-so, however, when viewed in context. For example, the April 7, 2000 letter in which Edward White told her, "I want you to know in no uncertain terms how much I need you here and want you to continue the good work you have been doing in managing our Accounting Department" also warned her that she was "not to confront [other staff members] nor to respond by being either uncooperative or unprofessional." Viewing the evidence in the light most favorable to Ms. Chang, this letter suggests that although IP3 may have been satisfied with her *accounting* work, there were some underlying concerns about her ability to get along with other staff members. With respect to the other letters that Ms. Chang relies upon as evidence that IP3

was satisfied with her performance, these letters merely refer to Ms. Chang's accounting work and do not establish that IP3 was satisfied with her professionalism or behavior on the job. See note 6, *supra.*

In addition, although Ms. Chang did receive an eleven percent pay raise three months prior to her termination, Matthew Hensley's November 13, 2000 e-mail to Ned White and Thomas White explained that the purpose of that raise was not to "reward" Ms. Chang for good performance, but rather to prevent Ms. Chang from leaving prior to January so that the year-end accounting would be completed more quickly in order to facilitate a merger or acquisition. In this e-mail message, the authenticity of which Ms. Chang does not dispute, Matthew Hensley told Ned White and Thomas White,

> I have told Teru that she has two months to demonstrate to IP3 that she is more than just loyal and hard-working but that she can modify her behavior now to work more productively with management and staff in the future. If she cannot, she will be terminated and knows why.

*Id.* Although Ms. Chang denies that she was ever told that her job was at risk, Ms. Chang admitted in her deposition that she had difficulty working under Ned White's supervision. She acknowledged that she had wilfully disobeyed Mr. White's request not to yell at her co-workers. She even testified that the day before she took protected leave, Mr. White had told her to "watch out" because she would soon be having her performance review. These admissions seriously undermine Ms. Chang's unsupported claim that she "never knew" her job was at risk or that her bosses at IP3 were unhappy with her behavior. Regardless, "plaintiff's perception of [her]self, and of [her] work performance

is not relevant. It is the perception of the decisionmaker which is relevant." *Smith v. Chamber of Commerce*, 645 F.Supp. 604, 608 (D.D.C.1986).

Ignoring the evidence of IP3's dissatisfaction with her professionalism, Ms. Chang argues that IP3's satisfaction with her accounting work coupled with the temporal proximity between her taking of protected leave and her termination proves that IP3's stated reason for firing her was pretext. In support of this argument, she cites to cases from other jurisdictions where courts have held that temporal proximity in conjunction with evidence of satisfaction with an employee's work performance is sufficient to show pretext. *See, e.g., Little v. Windermere Relocation, Inc.*, 265 F.3d 903, 915 (9th Cir.2001) (proximity and previous positive feedback demonstrates pretext under Title VII's opposition clause); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001) (close temporal proximity supported jury's finding of pretext in Title VII retaliation case); *Jaudon v. Elder Health, Inc.*, 125 F.Supp.2d 153, 169 (D.Md.2000) (temporal proximity and ongoing antagonism between plaintiff and decisionmaker evidence of pretext under Title VII opposition clause). These cases, however, are distinguishable from the case at bar.

None of the cases cited by Ms. Chang involve retaliation against an employee for taking protected FMLA leave. Rather, these cases arose under Title VII's so-called "opposition clause," which provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3 (a) (2000). The purpose of this language is to "prevent Title VII claims from being deterred" by an employer who might otherwise have motive to retaliate against an employee who makes such a claim. *Heuer v. Weil–McLain*, 203 F.3d 1021, 1023 (7th Cir. 2000). The very existence of an "opposition clause" thus presupposes an employer's motive for retaliation in such cases. Although the DCFMLA contains a similar "opposition clause" which makes it unlawful for an employer to discriminate against an employee for opposing an employer's unlawful practices under the DCFMLA, *see* D.C.Code § 36–1307(b) (1997), recodified at D.C.Code § 32–507(b) (2001), Ms. Chang's retaliation claim is fundamentally different. Ms. Chang alleges that IP3 fired her, not in retaliation for any *complaint* she had made about their DCFMLA practices, but rather because she took time off from work. Under circumstances where an employee has opposed or challenged the employment policies or practices of an employer, the temporal proximity of those complaints to an adverse employment action may be sufficient to show pretext. In such cases, the adversarial dynamic created when an employee challenges an employer's practices gives rise to an inference that the employer had a motive to retaliate. However, where an employee has merely availed herself of the benefits afforded by the DCFMLA by taking protected leave, the employer's motive to retaliate is less obvious. Therefore, in order to establish pretext when an employee alleges that she has been retaliated against for taking protected leave in violation of the DCFMLA, we require a greater showing than mere temporal proximity between the taking of leave and the adverse employment action.[11] Evidence that an em-

---

11. In *Carter–Obayuwana*, 764 A.2d at 792–93, this court determined that the temporal proximity between the plaintiff's complaints about sexually-discriminatory treatment and her

ployer had a strict attendance policy, a history of reprimanding employees for taking leave, or evidence that directly discredited the employer's stated reasons for terminating the plaintiff would suffice. If we were to require any less, "any employer who granted an employee leave under the [DC]FMLA would thereafter have its hands tied regarding any discipline of that employee." *Bond,* 77 F.Supp.2d at 305 (citation omitted).

Aside from her self-serving statements that she was a model employee at IP3, Ms. Chang simply has not put forward any affirmative evidence that would tend to discredit IP3's stated reason for firing her. She has not alleged that her employer had any general concerns with employees taking family or medical leave, or that she or any other employee had been reprimanded

for taking leave in the past. In fact, Ms. Chang admitted in her deposition that she had taken sick leave on a number of prior occasions and was not treated any differently when she returned to work. Accordingly, we find that Ms. Chang has failed to show that IP3's legitimate non-discriminatory reasons for terminating her were pretext. Therefore, we affirm the decision of the trial court to grant summary judgment for IP3.

*So ordered.*

---

subsequent reduction in salary permitted her retaliation claim to survive summary judgment and reach a jury. Like the other cases cited by Ms. Chang, however, *Carter–Obayuwana* involved a retaliation claim arising un-

der Title VII's opposition clause and, thus, is inapplicable to the case at bar.