**WASHINGTON CONVENTION CEN-
TER AUTHORITY and Lewis Daw-
ley, III, Appellants/Cross–Appellees,**

v.

**Langdon JOHNSON, Appellee/Cross–
Appellant.**

Nos. 04–CV–193, 04–CV–387.

District of Columbia Court of Appeals.

Argued Sept. 26, 2006.

Decided July 31, 2008.

David P. Durbin, with whom Joseph S. Ferretti and Deborah Murrell Whelihan, Washington, DC, were on the brief, for appellants/cross-appellees.

Amy R. Goldson, Washington, DC, with whom John Wesley Davis, was on the brief, for appellee/cross-appellant.

Before RUIZ, REID, and FISHER, Associate Judges.

FISHER, Associate Judge:

The case before us was tried by a jury, which found in plaintiff Langdon Johnson's favor on claims of age discrimination, violation of the District of Columbia Family and Medical Leave Act ("DCFMLA"), and

unequal pay. In a post-trial motion, the Washington Convention Center Authority ("WCCA") and Lewis Dawley (collectively, "defendants") requested judgment as a matter of law. The trial court denied their request, but reduced the damages award. Johnson also moved to alter or amend the judgment to award front pay. The trial court denied this motion. Each party has appealed. We affirm the judgment of the Superior Court, with one exception related to damages on the equal pay claim.

## I. Background

### A. Facts

In the late 1990s, WCCA was planning to build a new state-of-the-art convention center in the District of Columbia, and General Manager Lewis Dawley, who had been hired in June 1997, was eager to develop an aggressive marketing strategy. Langdon Johnson was WCCA's Director of Sales and Marketing and he reported directly to Dawley.

Johnson had been hired as an advertising sales executive in 1988, and the previous General Manager had promoted him to Sales Manager in 1990. In 1992, he was named Director of Sales and Marketing. Johnson had been responsible for marketing the existing convention center at both the national and local levels, he had received favorable evaluations and at least one bonus, and he won an industry award for a marketing brochure. In April 1998, Dawley changed Johnson's duties and title, stripping him of his responsibility for marketing and naming him Director of Sales. Dawley "assumed sole responsibility for all the marketing activities."

Lana Ostrander began working at WCCA as a Sales Associate in 1996. She reported directly to Johnson and Stacy Fleming, the Sales Manager, and earned about $38,000 per year. In September 1997, Ostrander submitted her resignation, but Johnson wanted to retain her services, so he arranged for her to talk with Dawley, who promoted Ostrander to be his Special Assistant. Dawley raised her annual salary to $58,000 and began to give her substantial marketing responsibilities. She was twenty-nine years old at the time of the promotion. In October 2000, Dawley appointed Ostrander to the newly-created position of Director of Marketing. He also increased her annual salary to $74,000. A few months later, in February 2001, Ostrander's salary was raised to $78,200. Ostrander was still employed by WCCA at the time of trial.

After Dawley hired Lee Fehrenkamp as Deputy General Manager in January 2000, Johnson began to report directly to Fehrenkamp. During the spring, Johnson was asked to prepare for the Board of Directors a sales report containing hotel booking information related to the new convention center. At the time, hotel bookings were the responsibility of the Visitors Bureau,[1] and because Johnson did not have the knowledge or experience necessary to adequately prepare the report, he was forced to work closely with that bureau. Based on his performance in preparing the report, Fehrenkamp concluded that Johnson did not understand the convention industry. He also concluded, from observing the sales department, that Johnson lacked leadership and planning skills. Fehrenkamp thought that Johnson had failed in his responsibility "to form a

---

1. Different witnesses referred to this organization by various names throughout the trial, but the parties to this appeal have called it the Visitors Bureau. In 1997, it was called the Washington Convention and Visitors Associa-tion, and was responsible for marketing the city as a destination as well as for marketing the convention center. Today the successor organization is called the Washington Convention and Tourism Corporation.

bridge of understanding" between WCCA and the Visitors Bureau. The importance of this relationship grew in August 2000, when Dawley negotiated a contract with the Visitors Bureau in order to strengthen the WCCA's positioning as a "destination within a destination."

Later in 2000, Fehrenkamp and Johnson began to interview candidates for two positions, Assistant Director of Sales and Sales Manager, that would have reported to Johnson as Director of Sales. Johnson, Fehrenkamp, and others interviewed Dawn Seay for the Sales Manager position in the summer of 2000. Thirty-six years old, Seay had more than four years of experience working at the Philadelphia Convention and Visitors Bureau, but she had never worked at a convention center. Because Dawley perceived that her qualifications fit WCCA's needs, he decided to hire her. Instead of filling one of the empty positions, however, Dawley hired Seay for the newly created position of Director of Sales (New Convention Center), abolished the position for which she had applied, and changed Johnson's job title to Director of Sales (Existing Convention Center). Ms. Seay began work in September 2000 at an annual salary of $80,000. At this time, Johnson had not received a raise in five years—he earned an annual salary of $76,395.

Although Dawley intended that Johnson and Seay work as a team, they were unable to do so. For example, they were to submit a jointly developed plan to address the staffing needs of their departments, but they could not cooperate. Dawley realized that the two Directors of Sales were incompatible and decided to return to a single Director of Sales position. On Tuesday, November 7, 2000, Dawley met with Johnson, Seay, Fehrenkamp, and Ce-cilia Bankins, the Director of Administration, to announce that Seay would be in charge of sales for both the new convention center and the existing convention center. However, just how this new hierarchy would affect Johnson's employment remained ambiguous, at least in the minds of some who attended the meeting. The experiment with two directors of sales had lasted less than two months. Once again there was one Director of Sales for both convention centers, but Seay—not Johnson—filled that position. Seay had been at WCCA less than two months and was still a probationary employee.

Over the next couple of days, Johnson sought out Dawley and Fehrenkamp, hoping to clarify his employment status. On Thursday, November 9, Johnson told Fehrenkamp that he was not feeling well and that he needed to see a doctor.[2] Johnson "started the dialogue about clarification," but Fehrenkamp said "don't worry about it, you go on and see your doctor." Friday, November 10, was a holiday, but on Monday, November 13, the next work day, WCCA received a doctor's note stating that Johnson had been advised to take leave from work for two to four weeks.

On December 5, 2000, Bankins wrote to Johnson providing "official notice" that his position as Director of Sales (Existing Convention Center) would be abolished, and that he would be terminated from his employment, effective December 8, 2000. The letter informed Johnson that his termination "result[ed] solely from a necessary business decision and is not related to your performance or any other personal factor." The letter also acknowledged that Johnson was then on sick leave and advised him that "[s]hould you decide to apply for and receive approval for job protec-

---

**2.** Johnson had been seeing a psychiatrist for treatment of depression since October 2000. He first started experiencing symptoms related to depression in June 2000.

tion under FMLA,"[3] his termination date would be adjusted to "sixteen weeks from the date on which you were initially placed in FMLA status."

On December 19, 2000, Johnson requested FMLA leave. The request was approved on January 12, 2001, and his leave was backdated to November 13, 2000. The FMLA leave could have lasted until March 5, 2001, but on January 30, 2001, Johnson's counsel notified WCCA that he was "able and prepared" to return to work. WCCA responded that "[t]here are no vacant positions within the WCCA Sales Division to which Mr. Johnson can return," and it adjusted his termination date to February 2, 2001. There were several other positions available when Johnson was ready to return to work, and WCCA invited him to apply for them, but it did not place him in any of the jobs. At the time of his termination, Johnson was fifty-five years old. He filed this lawsuit in June 2001.

Subsequently, Dawley determined that the appropriate entity for handling sales— for "spurr[ing] tourism in the District of Columbia"—was the Visitors Bureau. Therefore, he terminated Seay in July 2002, and sometime later abolished the position of Director of Sales at WCCA. See note 4, *infra*. Although the WCCA presently has a sales department, its primary responsibility is maintaining the convention center's books and contracts.

### B. The Trial

Johnson's complaint against WCCA and Dawley alleged age and sex discrimination as well as retaliation in violation of the District of Columbia Human Rights Act ("DCHRA"), violations of the DCFMLA, creation of a hostile work environment, and intentional infliction of emotional distress. An amended complaint added a count alleging "violation of equal pay and wage discrimination."

The case was tried before a jury beginning in the latter part of July 2003. Among other things, the jury heard about comments that Dawley made concerning the age of the older WCCA employees. Johnson testified that, "[e]arly on, when [Dawley] came to the convention center, he made comments about the age of sales staff and event services staff." "And he would say things to me like . . . you might be thinking about retirement. Are you thinking about retirement, or your wife has a nice company, why don't you think about retirement or moving on some place." Johnson also recalled: "I remember a comment [Dawley] made to me that if I didn't move on, I would probably end up like a gentleman by the name of Wild Bill Williams. Wild Bill Williams was an older gentleman who had worked at the Chicago Convention Center for years as a sales manager, I think, in the same position for a long time."

Theresa Miller, Dawley's executive assistant, testified that Dawley asked her why persons on the sales and marketing staff stayed so long. "I said because the environment is electric and . . . the pay is good. And he said that typically sales and marketing and the event services staff are much younger than the staff that we had at the convention center. And that over time the pounding of the pavement, because the floors were concrete, would take its toll on the employees, especially those that were not as young as perhaps he was accustomed to in other convention centers, or in the industry itself."

Johnson also testified that Dawley harassed and degraded him in the spring of 2000. Johnson approached Bankins to

---

**3.** A separate letter detailed his rights under the FMLA.

complain that Dawley was creating a hostile work environment by yelling at him "in front of clients, staff members, anybody," and that Dawley was favoring the female employees over Johnson. Johnson threatened to file, but ultimately refrained from filing, a formal complaint, and Bankins and Johnson continued to meet every week over the next several months.

Witnesses from the Visitors Bureau testified that Johnson worked well with them. The former president of the Visitors Bureau, Dan Mobley, testified that "[w]e had a very good working relationship with Mr. Johnson, as well as his staff," and that, in his opinion, WCCA sent Johnson on international trips in order to "put [their] best foot forward." Frank Rudman, the former vice president of convention sales at the Visitors Bureau, testified that Johnson was "very good at the trade show floor"—"He knew the customers. He knew the building well."

The jury found that Johnson's age was a substantial factor in the defendants' decision to terminate him, that defendants violated the DCFMLA by failing to reinstate Johnson to the same or an equivalent position, and that defendants violated the Equal Pay Act. It ruled in defendants' favor on the claims of unlawful retaliation, intentional infliction of emotional distress, and sex discrimination. The jury was not instructed on the hostile work environment claim.

The jury awarded compensatory damages in the following amounts: past wage loss to February 2003 ($152,790.00); past wage loss from February 2003 to August 4, 2003 (the date of the verdict) ($38,197.00);

past medical expenses ($11,000.00); and physical injury and emotional distress ($134,887.00). It awarded $1.00 in punitive damages in connection with its finding of age discrimination.

Defendants renewed their motion for judgment as a matter of law after the jury returned its verdicts. The trial court denied the motion with respect to the DCHRA, DCFMLA, and Equal Pay Act claims, but set aside the punitive damages, holding that "the record lacks evidence that Defendants' conduct was accompanied by the requisite evil motive or actual malice." The court also struck the jury's award for lost wages after February 2003, concluding that "[i]t is not fair to require WCCA to pay Plaintiff backpay for a job that indisputably no longer exists at WCCA.... The only reason the Court allowed the jury to award additional funds was to save the parties from a retrial if the Court's judgment in limiting back pay to the February 2003 date is deemed incorrect."[4]

Certain calculations of damages had been reserved for the trial court. With respect to the DCFMLA claim, the court awarded $174,726.28 for lost wages and benefits under D.C.Code § 32–509(b)(6)(A) (2001), but subtracted $152,790 (the amount of two years back pay) because "two years of back pay was already awarded by the jury" under the age discrimination claim, leaving $21,936.28. The court also awarded $174,726.28 to double the damages under D.C.Code § 32–509(b)(6)(B)(I) (2001), making the total recovery for the DCFMLA claim $196,662.56.[5] The court awarded Johnson

---

**4.** The court found that in February 2003 "the Director of Sales position was formally abolished and the sales function transferred to the Visitors' Bureau." Contrary to Johnson's argument, "the record [did] not establish that

the Sales Director job is still being performed at WCCA."

**5.** The trial court later amended the award to $196,518.02 to correct the calculation of interest.

$62,829.46 for the EPA claim.[6]

Defendants sought to reduce the award of damages further. On defendants' motion, the court reduced the award by $40,400, to account for income earned after the termination, leaving a total of $112,390 plus interest for the age discrimination claim. The trial court denied the remainder of the motion. Defendants also moved for a new trial. The court denied this motion in its entirety.

## II. Standard of Review

■ This court conducts a *de novo* review of a ruling granting or denying a motion seeking judgment as a matter of law after a jury verdict, applying in its analysis the same standard as the trial court. *See Railan v. Katyal*, 766 A.2d 998, 1006 (D.C.2001) (citing *Durphy v. Kaiser Foundation Health Plan of Mid–Atlantic States, Inc.*, 698 A.2d 459, 465 (D.C.1997)). "In our review, we must take care to avoid weighing the evidence, passing on the credibility of witnesses or substituting [our] judgment for that of the [ ] jury." *Cook v. Edgewood Management Corp.*, 825 A.2d 939, 945 (D.C.2003) (internal quotations marks and citation omitted). "When determining whether ... judgment as a matter of law is warranted for the employer, the court considers all relevant evidence presented by the plaintiff and defendant." *Brady v. Office of Sergeant at Arms*, 380 U.S.App. D.C. 283, 288, 520 F.3d 490, 495 (2008) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Judgment as a matter of law must be granted if, viewing the evidence in the light most favorable to the non-moving party, there is "no legally sufficient evidentiary basis for a reasonable

jury to find" for the non-moving party. *Railan*, 766 A.2d at 1006 (citing Super. Ct. Civ. R. 50); *accord, Washington Metropolitan Area Transit Authority v. Jeanty*, 718 A.2d 172, 174 (D.C.1998).

## III. Age Discrimination Under the DCHRA

### A. The Legal Framework

■ The DCHRA prohibits an employer from discharging an employee based on age or other prohibited reasons. D.C.Code § 2–1402.11(a)(1) (2001). Where a case has been fully tried on the merits and comes before us to review a ruling on a motion for judgment as a matter of law, "the *McDonnell Douglas [Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ] framework—with its presumptions and burdens—is no longer relevant." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714–15, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). At this point, "the factual inquiry proceeds to a new level of specificity," *Aikens*, 460 U.S. at 715, 103 S.Ct. 1478 (internal quotation marks and citations omitted), meaning that the ultimate question of "whether the defendant intentionally discriminated against the plaintiff," *id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)), "now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *St. Mary's Honor Center*, 509 U.S. at 516, 113 S.Ct. 2742.

---

**6.** The trial court later amended the award to $62,809.74 to correct the calculation of interest.

■ We may consider a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097. We also must keep in mind that " 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *McFarland v. George Washington University,* 935 A.2d 337, 346 (D.C.2007) (quoting *St. Mary's Honor Center,* 509 U.S. at 507, 113 S.Ct. 2742) (additional internal quotation marks and citation omitted).

**B. Johnson Produced Sufficient Evidence for the Jury to Find Age Discrimination**

■ For claims of age discrimination based on disparate treatment under the DCHRA, "liability depends on whether [age] actually motivated the employer's decision." *Reeves,* 530 U.S. at 141, 120 S.Ct. 2097.[7] "That is, the plaintiff's age must have actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Id.* (internal quotation marks omitted); *see also Futrell v. Dep't of Labor Federal Credit Union,* 816 A.2d 793, 803 (D.C.2003) (" 'the employee retains the ultimate burden of persuading the finder-of-fact that the employer acted with discriminatory an-

imus' " (quoting *Blackman v. Visiting Nurses Ass'n,* 694 A.2d 865, 868 (D.C. 1997))).

Defendants have argued that they established two "major" nondiscriminatory reasons for terminating Johnson: (1) his performance was inadequate, and (2) they made their decision in "light of the New Convention Center demands for a re-organization of the sales department."[8] Defendants presented evidence that Johnson was no longer qualified because the requirements of his position had evolved. In their view, "[w]hile Johnson may have initially been qualified to lead the provincial Existing Convention Center, he lacked the sophistication, skill set, and current business acumen necessary to lead the sales team for the New Convention Center." Defendants point principally to testimony by Bankins and Dawley that Johnson was not an effective manager or Director of Sales. Two of Johnson's former subordinates testified that he was a poor manager. Other employees complained about having to do Johnson's work. Both Dawley and Fehrenkamp testified that there were numerous other performance-related problems, including difficulty developing the sales report in the spring of 2000. As the trial court summarized when denying defendants' post-trial motion for judgment as a matter of law: "Defendants offered evidence which, if believed, would allow a rational trier of fact to conclude that Plaintiff was terminated because he was not up to the job of selling the old (and new)

---

7. This court has looked to federal court decisions interpreting the federal Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U.S.C. § 621 *et seq.,* when evaluating age discrimination claims under the DCHRA. *See McManus v. MCI Communications Corp.,* 748 A.2d 949, 955 n. 7 (D.C. 2000).

8. Although defendants state that they proffered "numerous" legitimate, nondiscriminatory reasons, they argue only two with enough detail to be considered on appeal. *See Wagner v. Georgetown University Medical Center,* 768 A.2d 546, 554 n. 9 (D.C.2001) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).

convention center in the hard driving culture demanded of everyone by General Manager Lewis Dawley."

This explanation was not conclusive, however, and Johnson presented enough evidence to create a factual issue for the jury to resolve. He points to his performance evaluations to rebut the claim that he was not qualified. In November 1999, Dawley gave Johnson an overall rating of "excellent," the highest summary rating available. The most relevant evaluation, signed by Dawley and dated October 20, 2000 (less than three weeks before Dawley displaced him), gave Johnson a summary rating of "above average."[9] Although that performance review, which occurred several months after Johnson's "failed" attempt to produce the sales report, indicates a need for improvement in some areas, Dawley indicated that Johnson "[c]onsistently exceed[ed] job requirements" in the categories of contract management, technical skills and knowledge, and one component of management of staff and resources. Furthermore, the letter which informed Johnson of his dismissal explicitly states that his termination was "not related to [his] performance or any other personal factor." On the basis of this evidence, a reasonable jury could find that the explanation given by the defendants was not the actual reason for his termination. *Esteños v. PAHO/WHO Federal Credit Union*, No. 04–CV–1093, 952 A.2d 878, 895–96 (D.C. 2008); *Brady*, 380 U.S.App. D.C. at 288, 520 F.3d at 495.

The jury could have found direct evidence of discriminatory intent based on the testimony of Johnson and Miller reporting Dawley's comments about older WCCA workers.[10] The force of these com-

---

9. Although there was a factual disagreement at trial about whether that overall rating accurately summarized the scores on individual factors, it is uncontested that Johnson was never rated below the satisfactory mark.

10. Defendants argue that these "allegedly age discriminatory statements" made by Johnson and Miller "are unrelated to the allegedly discriminatory employment actions and too remote in time," without more, to contribute to Johnson's evidence. The cases cited by defendants are easily distinguishable on their facts, however. *McManus v. MCI Communications Corp.*, 748 A.2d 949 (D.C.2000), upheld a grant of summary judgment on a claim of discrimination based on personal appearance supported only by facially complimentary comments by three individuals, only one of whom was alleged to have been involved in the termination decision. *Id.* at 955–56. The court held that there was "no demonstrable nexus ... between the comments allegedly made about her personal appearance and the decision to terminate her employment." *Id.* at 957. Here, however, there is evidence of deprecatory comments about aging workers (one suggesting that Johnson should retire) made by the person directly responsible for Johnson's termination. There also was circumstantial evidence of discriminatory intent.

In *Hollins v. Federal National Mortgage Ass'n*, 760 A.2d 563 (D.C.2000), we upheld a grant of summary judgment to the employer where the plaintiff claimed direct evidence of discrimination in the form of a single stray comment. Characterizing the case as "one of the rare situations in which summary judgment ... is appropriate" in the context of determining discriminatory motive or intent, *id.* at 571, we held that there was "no legally cognizable connection between Small's comment [occurring two and a half years before termination, and not specifically directed at the plaintiff] and the alleged discriminatory animus which Hollins claims resulted in his termination." *Id.* at 575–76. The court explained that, " '[a]bsent a causal link between the references and the conduct complained of, such epithets become stray remarks that cannot support a discrimination verdict.' " *Id.* at 575 (quoting *Boyd v. State Farm Insurance Cos.*, 158 F.3d 326, 330 (5th Cir.1998)). Here, of course, there is both a causal link and a multiplicity of comments. Johnson testified that Dawley, who was directly responsible for his termination, specifically asked him why he didn't think about retiring and Miller testified that Dawley remarked on the age of the employees he had working for him.

ments is counter-balanced by the fact that Dawley had recently hired Fehrenkamp, who was sixty-one in October 2000, but this competing evidence is not powerful enough to require a ruling in defendants' favor. The jury could have also found circumstantial evidence of discriminatory intent in Dawley's favorable treatment of Dawn Seay and Lana Ostrander, both of whom were significantly younger than Johnson. Furthermore, as the trial court noted, the jury was entitled to take defendants' contradictory positions into account when addressing whether they had intentionally discriminated. *See Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

Defendants also argue that Johnson did not offer any evidence to show that their business-based explanation was false. They say that Dawley was experimenting with the organization of the staff: "[a]s the result of the switch back to a combined Director of Sales position, Johnson's position was abolished, and there was no equivalent director position left for him to fill." Defendants assert that their evidence demonstrated a legitimate, nondiscriminatory reason for reorganization based on Dawley's concern that the new convention center be successful and profitable.

While it may be literally correct to say, as defendants do, that Dawley "abandoned the idea of having two directors of sales and chose Seay" for the combined position, the jury could not have failed to notice that this "reorganization" essentially restored the status quo of having a single Director of Sales that existed before Seay arrived,

less than three months before Johnson's termination. Moreover, as a result of this short-lived experiment, the older, more-experienced Johnson was pushed out in favor of the younger, newly-hired, and largely-untested Seay. *See McFarland,* 935 A.2d at 354 ("An inference of discrimination is most natural when the plaintiff's job has not really been eliminated, but instead filled by others outside his protected class."). Although the subsequent termination of Seay and the elimination of the Director of Sales position support defendants' argument that they were experimenting with organization of the staff, that evidence is not so compelling as to preclude the jury from finding that defendants discriminated against Johnson. For these reasons, we see no legal justification for disturbing the jury's verdict that Johnson was the victim of age discrimination.

## IV. The DCFMLA Claim

■ "The DCFMLA was designed to 'ensure job security and health benefits to an employee during a temporary period of absence resulting from a ... serious health condition[ ].' " *Chang v. Institute for Public–Private Partnerships, Inc.,* 846 A.2d 318, 326 (D.C.2004) (quoting legislative history; editing appears in *Chang*).[11] Among other things, it "provides employees of a covered employer with sixteen weeks of protected medical leave during any twenty-four-month period." *Chang,* 846 A.2d at 326; *see* D.C.Code § 32–503(a) (2001). The DCFMLA also creates certain substantive rights, including a right to reinstatement, which is at issue here.

■ Like its federal counterpart, the DCFMLA recognizes two theories for recovery-"the retaliation or discrimination theory and the entitlement or interference

---

11. Defendants do not challenge the jury's finding that Johnson had a "serious health condition" as defined in the DCFMLA. *See* D.C.Code § 32–501(9) (2001).

theory." *Smith v. Diffee Ford–Lincoln–Mercury, Inc.,* 298 F.3d 955, 960 (10th Cir.2002); *see also Kauffman v. Federal Express Corp.,* 426 F.3d 880, 884 (7th Cir. 2005); *Hoge v. Honda of America Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir.2004). The retaliation or discrimination theory arises from D.C.Code § 32–507(b), which, among other things, makes it "unlawful for an employer to discharge or discriminate in any manner against any person because the person ... [o]pposes any practice made unlawful by this chapter."[12] D.C.Code § 32–507(b)(1) (2001). The entitlement or interference theory is based upon D.C.Code § 32–507(a), which provides that "[i]t shall be unlawful for any person to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided by this chapter...." "If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent." *Smith,* 298 F.3d at 960; *see also Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 331 (1st Cir.2005) ("no showing as to employer intent is required"). Because the jury found that "WCCA violate[d] the FMLA by failing to reinstate [Johnson] to the same or an equivalent position[,]" this is an entitlement case.

 Under the Act, "an employee returning from medical leave will be restored to the same position which that employee held when the leave began, or to an equivalent position." *Harrison v. Children's National Medical Center,* 678 A.2d 572, 575 (D.C.1996); *see* D.C.Code § 32–505(d) (2001) ("the employee *shall* be [r]estored ... to [a] position of employment" (emphasis added)). The Act permits some flexibility, however. "The 'equivalent position' provision under [29 U.S.C.] § 2614(a)(1)(B)

recognizes the dynamic needs of employers and permits them to restore employees to positions other than the exact one they left...." *Hoge,* 384 F.3d at 249.

 Neither the DCFMLA nor the District of Columbia's implementing regulations, *see* 4 DCMR §§ 1600–1699, define "equivalent position" beyond noting that it "includes equivalent employment benefits, pay, seniority, and other terms and conditions of employment." D.C.Code § 32–505(d)(2) (2001). However, both the DCFMLA and the FMLA use the term "equivalent position" in the identical context of defining the employee's reinstatement rights. Thus, although the federal authorities are not binding on us, "we may properly look to FMLA regulations and case law as persuasive authority in interpreting our own statute." *Chang,* 846 A.2d at 327; *see* 29 C.F.R. § 825.215 (entitled "What is an equivalent position?").

An equivalent position is " 'virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.' " *Smith v. East Baton Rouge Parish School Bd.,* 453 F.3d 650, 651 (5th Cir.2006) (quoting 29 C.F.R. § 825.215(a)). However, the requirement of equivalence does not extend to de minimis, intangible, or unmeasurable aspects of a job. *Montgomery v. Maryland,* 266 F.3d 334, 341 (4th Cir.2001) (citing 29 C.F.R. § 825.215(f)), *vacated on other grounds,* 535 U.S. 1075, 122 S.Ct. 1958, 152 L.Ed.2d 1019 (2002).

The record establishes that Johnson was on DCFMLA leave when he received "offi-

---

**12.** *Chang v. Institute for Public–Private Partnerships, Inc.,* 846 A.2d 318 (D.C.2004), involved a claim of retaliation. *See id.* at 325, 329.

cial notice" that his position was being abolished and that his employment would be terminated at the close of business on December 8, 2000.[13] It is also clear that WCCA did not reinstate him to the same or an equivalent position at the end of his leave. On appeal, defendants make two arguments attacking the verdict: (1) Johnson's job would have been eliminated anyway, and (2) there was no equivalent position in which they could place him.

We agree that the DCFMLA does not create an absolute right to reinstatement. It is well-established that the federal FMLA, to which we may look for guidance, "simply does not force an employer to retain an employee [who is] on FMLA leave when the employer would not have retained the employee had the employee not been on FMLA leave." *Throneberry v. McGehee Desha County Hospital,* 403 F.3d 972, 977 (8th Cir.2005). Federal regulations explicitly recognize that "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a); *see, e.g., Renaud v. Wyoming Dep't of Family Services,* 203 F.3d 723, 732–33 (10th Cir.2000) (defendant did not interfere with plaintiff's rights under the FMLA where plaintiff was terminated for previous use of alcohol on the job and would have been dismissed regardless of FMLA leave); *Ilhardt v. Sara Lee Corp.,* 118 F.3d 1151, 1157 (7th Cir.1997) (holding that an employer may terminate an employee on FMLA leave

whose job was eliminated as part of a reduction in force); *Price v. Washington Hospital Center,* 321 F.Supp.2d 38, 47 (D.D.C.2004) (same).

Relying upon such precedent, WCCA argues that "[a]lthough Johnson was not formally terminated until after he began his sick leave, Defendants offered ample evidence that Johnson would have been formally terminated regardless of whether he took leave." The burden is on the employer to show that, for other reasons, an employee would not have been employed when the time for reinstatement came. *See* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."); *Smith,* 298 F.3d at 963 ("[T]he regulation validly shifts to the employer the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave."); *Parris v. Miami Herald Publishing Co.,* 216 F.3d 1298, 1301 n. 1 (11th Cir.2000) ("Under the FMLA regulations, if an employer interferes with an employee's right to reinstatement under the FMLA, the employer bears the burden of proving that the employee would have been laid off during the FMLA period for reasons unrelated to the employee's condition, and therefore is not entitled to restoration."). Thus, the trial court in this case instructed that "[y]our verdict must be for Defendants if it has been proved by a

---

**13.** Johnson's DCFMLA leave was backdated to November 13, 2000, because he was on sick leave beginning that day. Backdating is entirely permissible under the DCFMLA for proper calculation of the leave period. *See* D.C.Code § 32–503(b)(2) (2001) ("Any paid medical or sick leave provided by an employer that the employee elects to use for medical leave *shall count against* the 16 workweeks of

allowable medical leave under [the DCFMLA]." (emphasis added)); *Harrison v. Children's National Medical Center,* 678 A.2d 572, 577 (D.C.1996) (The DCFMLA "does not shield [an employee's] accrued sick leave from being included in the calculation of that protected period; indeed, it expressly states that such accrued leave 'shall count against' the sixteen weeks.").

preponderance of the evidence that the Plaintiff would have been terminated in the absence of the FMLA request for leave."

 The verdict demonstrates that the jury rejected this defense, and properly so. For an employer lawfully to deny an employee's restoration rights, it must show that the termination for other reasons would have been lawful. *Cf. Chang*, 846 A.2d at 329 ("the DCFMLA 'does not immunize an employee from *legitimate* disciplinary action by her employer for reasons unrelated to the employee's [protected] leave' " (quoting *Bond v. Sterling, Inc.*, 77 F.Supp.2d 300, 304 (N.D.N.Y.1999) (emphasis added))). Here, however, we have already upheld the jury's finding that Johnson's termination was unlawful because it was based on age discrimination. We cannot conclude that the same, unlawful, termination establishes a defense to the DCFMLA claim.

Defendants rely heavily on *Price v. Washington Hospital Center*, where the plaintiff conceded "that the position which she held at the time her medical leave commenced was eliminated pursuant to a [reduction in force]." 321 F.Supp.2d at 47. *Price* is easily distinguishable because our case involves an illegal discriminatory termination, not a legitimate reduction in force. WCCA did not carry its burden of showing that Johnson would have been terminated legitimately in December 2000 or February 2001 even if he had not taken DCFMLA leave. By contrast, it did persuade the trial court to cut off damages for back pay as of February 2003, finding that the Director of Sales position was eliminated at that time due to a reorganization at

WCCA. See note 4, *supra*. Had the defendants made a similarly convincing showing that a legitimate reorganization led to Johnson's termination, the jury might well have accepted their defense.

In the alternative, WCCA argues that it did not violate the DCFMLA because Johnson's position had been eliminated and there were no equivalent positions at the time he returned to work. We have already demonstrated that Johnson's position had not been lawfully eliminated as of that time. For that reason, as the trial court pointed out when denying defendants' motion for judgment as a matter of law, "[WCCA's] assertion of the nonavailability of [the] position [occupied by Seay] does not suffice to excuse it from its FMLA obligations." Moreover, there was conflicting evidence about whether equivalent positions were available. This thus became an issue of fact for the jury to resolve, and we cannot say on this record that there was "no legally sufficient evidentiary basis for a reasonable jury to find" in Johnson's favor. *See Railan*, 766 A.2d at 1006 (citing Super. Ct. Civ. R. 50).

For these reasons, we are not persuaded by the defendants' argument that the "unique facts of this case" precluded a reasonable jury from finding that defendants unlawfully denied Johnson's DCFMLA right to reinstatement.

## V. The Equal Pay Claim

 Under the EPA,[14] "[a] plaintiff who alleges that [ ]he was unlawfully paid less than a [wo]man must establish that the 'employer pays different wages to employees of opposite sexes for equal work

---

14. Although Johnson's amended complaint, which adds a count alleging "violation of equal pay and wage discrimination," fails to state the statutory basis for his claim, the trial court analyzed it under the federal Equal Pay Act, 29 U.S.C. § 206(d) (2000). The parties have equally treated the claim as if it arose under the federal statute. We note that the DCHRA provides for a similar cause of action. *See* D.C.Code § 2–1402.11(a)(1) (2001); *Howard University v. Best*, 484 A.2d 958, 984 (D.C.1984).

on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Howard University v. Best*, 484 A.2d 958, 984 (D.C.1984) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (construing Equal Pay Act)) (quotations omitted). "The phrase equal work does not require that the jobs be identical, but only that they be substantially equal." *Id.* (citations and quotations omitted). "Skill includes consideration of such factors as experience, training, education and ability." *Id.* (citations and quotations omitted). "Responsibility involves the degree of accountability required in the performance of the job; the controlling factor is not job title but job content—the actual duties that the respective employees are called upon to perform." *Id.* (citations and quotations omitted).

As the trial court pointed out, "it is undisputed that Seay was paid more than [Johnson] for a job that undisputably was considered 'equivalent.'" Defendants argue, nevertheless, that they established one of the Act's affirmative defenses—that the pay differential was based on something other than sex. *See* 29 U.S.C. § 206(d)(1)(iv) (2000). They assert that Seay's higher pay was justified by her skills and experience, and by "the importance of having a strong relationship with the Visitors Bureau." But defendants do not convincingly explain why they paid Seay more money at the outset, before she had a chance to demonstrate her abilities. Moreover, Johnson offered evidence that he maintained a good relationship with the Visitors Bureau. The trial court instructed the jury that WCCA could defeat Johnson's claim "if its decision on pay was based on any factor other than sex or gender," and the jury rejected that defense.

Recognizing the limitations of our role when reviewing the denial of a post-verdict motion for judgment as a matter of law, *see George Washington University v. Violand*, 940 A.2d 965, 980 (D.C.2008) (citing *Liu v. Allen*, 894 A.2d 453, 459 n. 10 (D.C.2006)), we are unpersuaded by WCCA's argument. On the basis of the record before us, we see no justification for upsetting the jury's verdict on liability under the EPA.

We will, however, ask the trial court to clarify its award of damages for the EPA claim. The parties asked the jury to decide the issue of liability under the EPA, but stipulated that the trial court would determine damages. Their stipulation reads, in relevant part:

> [The parties] have agreed that the damages available under the Equal Pay Act are \$3,235.20[1] and the Parties have agreed that the Court should decide the amount of these damages....

---

[1] [T]he difference between what Ms. Seay was paid for the pay period of September 18, 2000 through November 12, 2000 (\$80,000–\$76,395) added to the difference between what Ms. Seay was paid for the pay period of November 12, 2000 through February 1, 2001 including the payments made retroactively on February 23, 2001 (\$88,000.00–\$76,395).

We have recognized that "parties may stipulate to the extent of their damages, ... [as well as] to the means to be employed in calculating their damages...." *Goozh v. Capitol Souvenir Co., Inc.*, 462 A.2d 1140, 1142 n. 4 (D.C.1983); *see also Waverly Taylor, Inc. v. Polinger*, 583 A.2d 179, 181 (D.C.1990) ("The court awarded Polinger damages of \$150,000.00, an amount stipulated by the parties prior to trial.").

Although the trial court explained clearly and in great detail how it calculated damages in the amount of \$62,829.46,[15] its

---

**15.** See note 6, *supra*.

memorandum and order does not reference the stipulation. For this reason, defendants argue on appeal that the "trial court abused its discretion by disregarding the stipulation and by failing to explain in its Memorandum its reason for disregarding the stipulation." The defendants interpret the stipulation as establishing "that the damages available under the EPA would be $3,235.20."[16] Johnson counters that the stipulation is simply an agreement "that $3,235.20 would be minimally available if the jury found an EPA violation. The stipulation by its terms leaves to the Court discretion to determine the actual amount of damages thereunder."

Defendants ask us to vacate and remand with instructions to reduce the award of damages on the EPA claim to $3,235.20. However, neither party has persuaded us that its interpretation conveys the plain meaning of the stipulation. For this reason, we remand the issue of damages under the EPA to the trial court, which may conduct further fact-finding to determine the intentions of the parties. *See Tillery v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C.2006) (" 'If the court finds that the contract has more than one reasonable interpretation and therefore is ambiguous, then the court— after admitting probative extrinsic evidence—must determine what a reasonable person in the position of the parties would have thought the disputed language meant.' " (quoting *In re Bailey*, 883 A.2d 106, 118 (D.C.2005))).[17]

## VI. Back Pay and Front Pay

Johnson asserts that the trial court abused its discretion when it failed to award him back pay for the period from February 3, 2003, to August 4, 2003. The first date is when the Director of Sales position at WCCA was abolished and the latter is when the jury returned its verdict. He also complains that the trial court failed to reinstate him or to award front pay in lieu of reinstatement.

"Generally, in reviewing challenges to equitable relief granted in employment cases . . ., we 'consider[ ] whether the [trial court] was clearly erroneous in its factual findings and whether it abused its traditional discretion to locate a just result in light of circumstances peculiar to the case.' " *Watkins v. District of Columbia*, 944 A.2d 1077, 1081 (D.C.2008) (quoting *Fogg v. Gonzales*, 377 U.S.App. D.C. 148, 153, 492 F.3d 447, 452 (2007) (citation and internal quotation marks omitted)). "The trial court 'has broad discretion to fashion appropriate equitable relief for a . . . plaintiff including, but not limited to, reinstatement; this court's review is therefore limited to determining whether the [trial] court abused that discretion.' " *Id.* (quoting *Webb v. District of Columbia*, 331 U.S.App. D.C. 23, 35, 146 F.3d 964, 976 (1998) (citations and internal quotation marks omitted)). "The trial court may 'order such affirmative action as may be appropriate, which may include, but is not limited to, . . . hiring of employees, with or without back pay, . . . or any equitable

---

16. This is not a new interpretation crafted by defendants for purposes of this appeal. In their opposition to a post-trial motion filed by Johnson, the defendants pointed out that they had elsewhere "argued as to why the verdict in favor of the plaintiff as to [the EPA] claim should be reversed." Should they lose that argument, however, "[t]he defendants stipulated to the amount of damages and do not contest that issue."

17. Defendants also argue that it was error to award both liquidated damages and prejudgment interest on the EPA claim. *See, e.g., Doty v. Elias*, 733 F.2d 720, 726 (10th Cir. 1984). If, on remand, the trial court adheres to its original method of calculating damages, it should consider this issue as well.

relief as the court deems appropriate....'" *Id.* (citing *Ford Motor Co. v. Equal Employment Opportunity Comm'n,* 458 U.S. 219, 226, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (emphasis omitted)). Front pay is also an available remedy for discriminatory termination. *See Ottenberg's Bakers, Inc. v. District of Columbia Comm'n on Human Rights,* 917 A.2d 1094, 1105 & n. 19 (D.C.2007); *see also Davis v. Combustion Engineering, Inc.,* 742 F.2d 916, 922 (6th Cir.1984) ("front pay" is an award of damages in lieu of reinstatement after trial); *accord Endres v. Helms,* 617 F.Supp. 1260, 1269 (D.D.C.1985).

■ We have reviewed the record and see nothing to persuade us that the trial court abused its discretion in refusing to award damages between February 3, 2003, and August 4, 2003. *See Johnson v. United States,* 398 A.2d 354 (D.C.1979) (comprehensive discussion of abuse of discretion standard of review). The court found that the Sales Director job had been eliminated in February 2003 and reasoned that "[it] is not fair to require WCCA to pay Plaintiff backpay for a job that indisputably no longer exists at WCCA." Johnson argues that this determination is clearly erroneous, but fails to point us to evidence in the record which satisfies this demanding standard. *See Wolf v. District of Columbia,* 597 A.2d 1303, 1308 (D.C.1991) ("'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985))). The same eminently sensible reasoning justifies the denial of reinstatement or front pay. As defendants point out, "Johnson, like Seay, would have been terminated in February 2003, at the latest."

## VII. The Trial Court Did Not Abuse Its Discretion in Denying Defendants' Motion for New Trial

Defendants contend that the trial court abused its discretion by denying their motion for a new trial "without first considering or addressing" their arguments that the verdicts were "against the clear weight of the evidence." They also criticize the court for "omitting its reasoning." "Alternatively," they assert, "if the trial court adequately considered the issue, the trial court abused its discretion in denying Defendants' motion for new trial since the verdict was against the clear weight of the evidence."

■ We reject these arguments. "A trial court has broad latitude in ruling on a motion for new trial," *see Faggins v. Fischer,* 853 A.2d 132, 140 (D.C.2004) (citations and quotations omitted), and its ruling is reviewed only for abuse of discretion. *See Lewis v. Voss,* 770 A.2d 996, 1002 (D.C.2001). The trial court has "'the power *and* [the] *duty* to grant a new trial if the verdict[ ] [is] against the clear weight of the evidence, or if for any reason or combination of reasons justice would miscarry if [the verdict] were allowed to stand.'" *Gebremdhin v. Avis Rent–A–Car System, Inc.,* 689 A.2d 1202, 1204 (D.C. 1997) (emphasis and alterations in original) (quoting *Fisher v. Best,* 661 A.2d 1095, 1098 (D.C.1995)).

There is no doubt that the trial court devoted more pages to discussing and denying defendants' motion for judgment as a matter of law. Nevertheless, its separate opinion denying the motion for a new trial followed defendants' lead in their motion and their supporting memorandum. When seeking a new trial, the defendants incorporated by reference their motion for judgment as a matter of law, and, although the court's opinions were issued on differ-

ent dates, we think it only fair to read them in combination.

In its opinion denying the Rule 50 motion, the court demonstrated that the verdicts were supported by the evidence. Here, the court acknowledged its authority to grant a new trial when the verdict is against the weight of the evidence, and it explained its reasons for not doing so: "Credibility determinations are for the jury to make, and this Court will not second guess the jury's verdicts which *in this case* are supported by adequate evidence." (emphasis added.) In context, it is clear that the court considered and rejected defendants' argument. Furthermore, we do not view the evidence in defendants' favor as so weighty that the trial court abused its discretion in denying their motion. *See Gebremdhin,* 689 A.2d at 1204.

### VIII. Remaining Claims

 Johnson has informed us that he no longer challenges the trial court's treatment of his hostile work environment claim and his claim of reprisal. Although he has argued that it was error for the trial court to set aside the jury's award of one dollar in punitive damages, he did so for the first time in his reply brief. Because arguments raised for the first time in a reply brief come too late for appellate consideration, we decline to rule on this issue. *See District of Columbia v. Patterson,* 667 A.2d 1338, 1346 n. 18 (D.C.1995).

The trial court deferred its ruling on the issue of attorney's fees, a decision within its discretion under Superior Court Civil Rule 54(d)(2). We understand from a statement by Johnson's counsel at oral argument that she discussed this issue in the briefs only to make clear that she was not abandoning her claim. She agreed that there is no issue with respect to attorney's fees for us to resolve at this time.

### IX. Conclusion

For the reasons discussed above, we affirm the judgment of the Superior Court, with one exception. With respect to damages on the equal pay claim, we vacate the judgment and remand to the trial court for further proceedings consistent with this opinion.

*So ordered.*